Jennie Lee Anderson (SBN 203586)
jennie@andrusanderson.com
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA  94104
Telephone:     (415) 986-1400
Facsimile:     (415) 986-1474

Matthew Bergman (*Pro Hac Vice application forthcoming*)
matt@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone:     (206) 741-4862
Facsimile:     (206) 957-9549

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| TAMMY RODRIGUEZ, individually and as the Personal Representative of the Estate of Selena Rodriguez, <br><br> Plaintiff, <br><br>    v. <br><br> META PLATFORMS, INC., formerly known as FACEBOOK, INC.; and SNAP, INC., <br><br> Defendants. | NO. <br><br> COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP, AND FOR VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW, BUS. & PROF. CODE §§17200, *ET. SEQ* <br><br> JURY DEMAND |

In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . . Technology companies must step up and take responsibility for creating a safe digital environment for children and youth. Today, most companies are not transparent about the impact of their products, which prevents parents and young people from making informed decisions and researchers from identifying problems and solutions.

*Protecting Youth Mental Health* United States Surgeon General's Advisory, December 7, 2021

Plaintiff Tammy Rodriguez, on behalf of herself and as the representative of the Estate of Selena Rodriguez, brings this action against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook" or "Meta"), doing business as Instagram ("Instagram") and Snap, Inc., doing business as Snapchat ("Snapchat"), and alleges as follows:

## I.    INTRODUCTION

1.    This product liability action seeks to hold Defendants responsible for causing and contributing to burgeoning mental health crisis perpetrated upon the children and teenagers in the United States by Defendants and, specifically, for the wrongful death of 11-year-old Selena Rodriguez caused by Selena's addictive use of and exposure to Defendants' unreasonable dangerous and defective social media products. After struggling with the harmful effects of social media, Selena took her own life on July 21, 2021.

2.    On December 7, 2021, the United States Surgeon General issued an advisory cataloging extensive evidence showing a dramatic increase in teen mental health crises including suicides, attempted suicides, and inpatient mental-health admissions. Between 2007 and 2018, for example, suicide rates among youth ages twelve to sixteen in the U.S. increased a staggering 146 percent. The incidence of serious depression and dissatisfaction with life in this age group has likewise increased dramatically.

3.    The most significant and far-reaching change to the lives of young people during this period was the widespread adoption of mobile social media platforms, prominently the Instagram and Snapchat products designed and distributed by Defendants.  According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly." Many children and teenagers spend hours throughout the day and night using Defendants' Instagram and Snapchat products.Peer reviewed studies and the available medical science have identified a particular type of social media and electronic device use associated with major mental health injuries, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Both large observational studies and experimental results point to the heavy use of Defendants' social media

products as a material cause of increased depression, suicidal ideation, and sleep deprivation among teenagers, particularly teenage girls.

4.      Defendants have invested billions of dollars to intentionally design their products to be addictive and encourage use that they know to be problematic and highly detrimental to their users' mental health. For example, internal, non-public data collected by Instagram and Snapchat reveal large numbers of its users—particularly teenage girls—are engaging in problematic use of its products. Indeed, the problematic use identified in the medical literature is precisely the type of use Defendants have designed their products to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that are well-recognized to cause all of the hallmarks of clinical addiction.

5.      Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minor users in particular. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

6.      Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of danger of mental, physical, and emotional harms arising from foreseeable use of their social media products. The addictive quality of Defendants' products and their harmful algorithms are not fully known or appreciated by minor users and their parents.

7.      Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers.  Defendants knew, or in the exercise or ordinary care should have known, that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. In other words, Defendants intentionally created an attractive nuisance to young children, but failed to provide adequate safeguards from the harmful effects they knew were occurring on their wholly owned and controlled digital premises, which Defendants refer to interchangeably as the

"metaverse."

8.     Further, Plaintiff brings claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, §§17200, *et seq.* The conduct and omissions alleged herein constitute unlawful, unfair, and/or fraudulent business practices prohibited by the UCL.

## II.     PARTIES

9.     Plaintiff Tammy Rodriguez is an individual residing in Enfield, Connecticut, and is being appointed the administrator of the Estate of Selena Rodriguez, who was her daughter. Selena Rodriguez passed away on July 21, 2021.

10.     Plaintiff Tammy Rodriguez has not entered into a User Agreement or other contractual relationship with any of the Defendants herein in connection with Selena Rodriguez's use of their social media products.  As such, in prosecuting this action Plaintiff is not bound by any arbitration, forum selection, choice of law or class action waiver set forth in said User Agreements.

11.     Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Instagram social media platform, an application that is widely available to users throughout the United States.

12.     Defendant Snap, Inc. is a Delaware corporation with its principal place of business in Santa Monica, CA. Defendant Snap owns and operates the Snapchat social media platform, an application that is widely marketed by Snap and available to users throughout the United States.

## III.     JURISDICTION AND VENUE

13.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

14.     This Court has personal jurisdiction over Defendants because they are each headquartered and have their principal place of business in the State of California.  Venue is proper in this District under 28 U.S.C. § 1391(b) (1) because Defendant Meta's principal place of business is in

the Northern District of California and Defendant Snap, Inc. is a resident of the State of California.

## IV.    DIVISIONAL ASSIGNMENT

15.    The case is properly assigned to the San Francisco Division pursuant to Civ. L. R. 3-2(c)-(d) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in San Mateo County, where Defendant Meta Platforms, Inc. maintains its primary place of business.

## V.    FACTUAL ALLEGATIONS

### A.  Instagram Background

16.    Instagram is a photo sharing social media application that originally enabled users to post and share photos that could be seen by other users who "follow" the user. A user's followers could "like" and post comments on the photos. Instagram was purchased by Facebook, Inc. for approximately $1B in 2012.

17.    A user's "feed" is a comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram.

18.    Instagram also features a "discover" feature where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' demographics and prior activity in the application.

19.    Users' profiles on Instagram may be public or private. On public profiles, any user is able to view the photos, videos, and other content posted by the user. On private profiles, the users' content may only be viewed by the user's followers, which the user is able to approve. During the relevant period, Instagram profiles were public by default and Instagram allowed all users to message and send follow request to underage users, including Selena Rodriguez.

20.    During the last five years, Instagram has added features and promoted the use of short videos and temporary posts. The latter are referred to as "Reels" while the former are referred to as Instagram "Stories."

21.    Instagram notifies users through text and email of activity in which they might be interested, which is designed to and does prompt users to open Instagram and be exposed to content

selected by Instagram to maximize the length of time and amount of content viewed by the user.

22.    Over time, Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

### B.  Snapchat Background

23.    Snapchat is a photo and short video sharing social media application that allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. Snapchat also features a series of rewards including trophies, streaks, and other signals of social recognition similar to the "likes" metrics available across other platforms.  These features are designed to encourage users to share their videos and posts with the public. Users also have an explore feed that displays content created by other users around the world.

24.    Snapchat was founded in 2011 by current president and CEO Evan Spiegel and several co-founders from Stanford University.

25.    In 2014, Snapchat added "Stories" and "Chat" features that allowed users to post longer stories that could be viewed by users outside the user's friends. In 2014, Snapchat also released a feature called Snapcash that allowed users to send money to other users.

26.    Snapchat also allows users to enable the sharing of their location, which allows the user's followers (and the public for Snaps submitted by the users) to see the user's location on a map.

27.    By 2015, Snapchat had over 75 million monthly active users and is considered to be the most popular social media application amongst American adolescents in terms of the number of users and the time spent using the platform.

### C.  Defendants' Applications Are Products

28.    Both Instagram and Snapchat are products that are designed and manufactured by Meta and Snap, respectively. These products are designed to be used by children and are marketed to children across the United States. Further, Defendants are aware that large numbers of children under the age of 13 use their products despite user terms or "community standards" that purport to restrict use to

individuals who are 13 and older.

**D.  Defendants' Business Model is Based on Maximizing User Screen Time**

29.   Defendants do not charge their users for downloading or using their application products, but instead receive money from advertisers who pay a premium to target advertisements to specific demographic groups of users of the applications.

30.   As such, Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

31.   Snapchat utilizes unknown and changing rewards that are designed to prompt users to use Snapchat in excessive and dangerous ways. Snap knows or should know that its design has created extreme and addictive behaviors by its largely teenage and young-adult users. Indeed, Snap knowingly or purposefully designed its products to encourage such behaviors.

32.   All the achievements and trophies in Snapchat are unknown to users, and users do not find out about the criteria for specific achievements until they obtain or unlock them. This design conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time.

33.   This design is akin to a slot machine but marketed toward teenage users who are even more susceptible than gambling addicts to the variable reward and reminder system designed by Snap. The system is designed to reward increasingly extreme behavior because users are not actually aware of what action will unlock the next award.

34.   Instagram, like Snapchat, is designed around a series of design features that do not add to the communication utility of the application, but instead seek to exploit users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards, including "likes" and "followers." In the hands of children, this design is unreasonably dangerous to the mental well-being of underage users' developing minds.

35.   Internal Meta documents identify the potential of reduction in usage by their minor users as an "existential threat" to their business and spend billions of dollars per year marketing their products to minors.

**E. Defendants Have Designed Complex Algorithms to Addict Teen Users.**

36. Defendants have intentionally designed their products to maximize users' 'screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to two of the largest technology companies in the world.

37. Defendants designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use.

38. One of these features—present in both Snapchat and Instagram—is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never ending "feed." Defendants are well aware that algorithm-controlled feeds promote unlimited "scrolling"—a type of use that studies have identified as detrimental to users' mental health – however, this type of use allows Defendants to display more advertisements and obtain more revenue from each individual user.

39. The addictive nature of Defendants products and the complex and psychologically manipulative design of their algorithms is unknown to ordinary users.

40. Defendants have knowingly limited guardians' ability to monitor and prevent problematic use by their children.

**F. Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Makes Minors Less Resilient to Overcome Harmful Social Media Encounters**

41. Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

42. The frontal lobes—and in particular the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last

regions of the brain to mature.

43.     During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin.   Second, during childhood and adolescence, the brain is undergoing "pruning" - the paring away of unused synapses, leading to more efficient neural connections.   Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation.  This shift in the brain's composition continues throughout adolescence and continues into young adulthood.

44.     In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition.  As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

45.     The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

**G. Defendants Misrepresent the Addictive Design and Effects of Nature of Instagram and Snapchat.**

46.     During the relevant time frame, Defendants stated in public comments that their products are not addictive. Defendants knew or should have known that those statements were untrue.

47.     Neither Instagram or Snapchat warned users or their parents of the addictive and mentally harmful effects that the use of their products was known cause amongst minor users, like Selena Rodriguez.

**H. Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted or Created by Third Parties**

48.     Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

49.     Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third party's words. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for Defendants good faith attempts to restrict access to objectionable content.

50.     Plaintiff is not alleging that Defendants are liable for what the third parties said, but for what Defendants did or did not do.

51.     None of Plaintiff's Claims for Relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from anticipate use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe social products and furnish adequate warnings of foreseeable dangers arising out of the use of their products without altering, deleting, or modifying the content of a single third-party post or communication.

## VI.     PLAINTIFF-SPECIFIC ALLEGATIONS

52.     Decedent Selena Rodriguez was an 11-year-old girl who struggled for more than two years with an extreme addiction to Instagram and Snapchat.

53.     Selena Rodriguez began using social media approximately two years before her death by suicide on July 21, 2021.

54.     Plaintiff Tammy Rodriguez, Selena's mother, attempted multiple times to reduce or limit her daughter's use of social media, which caused a severe reaction by Selena due to her addiction to Defendants' products. Because Defendants' products do not permit parental controls, the only way for

Tammy Rodriguez to effectively limit access to Defendants' products would be to physically confiscate Selena's internet-enabled devices, which simply caused Selena to run away in order to access her social media accounts on other devices.

55.     Plaintiff Tammy Rodriguez attempted to get Selena mental health treatment on multiple occasions. An outpatient therapist who evaluated Selena remarked that she had never seen a patient as addicted to social media as Selena. In the months leading up to Selena's suicide, she was experiencing severe sleep deprivation that was caused and aggravated by her addiction to Instagram and Snapchat, and the constant 24-hour stream of notifications and alerts Defendants sent to Selena Rodriguez.

56.     Throughout the period of Selena's use of social media, Tammy Rodriguez was unaware of the clinically addictive and mentally harmful effects of Instagram and Snapchat.

57.     During the Covid-19 pandemic, Selena Rodriguez spent more and more time on Instagram and Snapchat, which only worsened her depression and level of sleep deprivation.

58.     As a proximate result of her use of Instagram and Snapchat, and specifically due to the intentionally addictive nature of these products, Selena Rodriguez had multiple absences from school that further deprived her of support services and caused the Connecticut Department of Children and Families to investigate.

59.     Through her use of Instagram and Snapchat, Selena Rodriguez had been messaged and solicited for sexual exploitive content and acts on numerous occasions by adult male users of Instagram and Snapchat, who are encouraged to use these platforms to sexually solicit and abuse minors due to Defendants' refusal to verify identity and age for new users.

60.     Prompted in part by Snapchat's "disappearing" message feature and other design features geared toward the promotion of sharing explicit images, Selena Rodriguez sent sexually explicit images using Snapchat, which were subsequently shared or leaked to her classmates, increasing the ridicule and embarrassment she experienced at school.

61.     Due to Selena Rodriguez's use of Instagram and Snapchat, she was hospitalized for emergency psychiatric care and experienced worsening depression, poor self-esteem, eating disorders, self-harm, and, ultimately, suicide.

//

62.     Defendants have designed Instagram and Snapchat, including through the use of disappearing or time limited messaging features, to frustrate and prevent parents like Tammy Rodriguez from exercising her right and duty as a parent to monitor and limit her child's use of Instagram and Snapchat.

63.     Defendants have designed Instagram and Snapchat to allow minor users to use, become addicted to, and abuse their products without the consent of the users' parents, like Tammy Rodriguez.

64.     Defendants have specifically designed Instagram and Snapchat to be attractive nuisances to underage users but failed to exercise ordinary care owed to underage business invitees to prevent the rampant solicitation of underage girls by anonymous older users who do not disclose their real identities, and mass message underage users with the goal of grooming and sexually exploiting minors.

65.     Defendants not only failed to warn Tammy and Selena Rodriguez of the dangers of addiction, sleep deprivation, and problematic use of their applications, but misrepresented the safety, utility, and addictive properties of their products. For example, the head of Instagram falsely testified under oath at a December 8, 2021 Senate Committee hearing that Instagram does not addict its users.

66.     As a result of Selena Rodriguez's addictive and problematic use of Instagram and Snapchat, she developed numerous mental health conditions including multiple inpatient psychiatric admissions, an eating disorder, self-harm, and physically and mentally abusive behaviors toward her mother and siblings.

67.     As a proximate result of her addiction to Instagram and Snapchat, Selena Rodriguez committed suicide on July 21, 2021. She was eleven years old at the time.

## VII.    PLAINTIFF'S CLAIMS

### COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

68.     Plaintiff realleges each and every allegation contained in paragraphs 1 through 68 as if fully stated herein.

69.     Under Restatement (Second) of Torts § 402(a), California and Connecticut law, one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the

condition which it was sold.

70.     Defendants designed, manufactured, marketed, and sold products that were unreasonably dangerous because they were designed to be addictive and detrimental to mental health of children to whom the Defendants knowingly marketed their products.

71.     Defendants' products were unreasonably dangerous because they contained numerous design characteristics that were not necessary for the utility provided to the user but were unreasonably dangerous and implemented by Defendants solely to increase the profits they derived from each additional user.

## A. Inadequate Safeguards from Harmful and Exploitative Content

72.     As designed, Snapchat, Instagram and Facebook algorithms are unsafe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures.  It is feasible to design an algorithm that substantially distinguishes between harmful and innocuous content and protects minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Defendants' social media products.  The cost of designing Defendants' algorithms to incorporate this safeguard would be negligible while the benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

73.     Reasonable users (and their parents) would not expect that Defendants' products would direct them to harmful content.

## B. Failure to Verify Minor Users' Age and Identity

74.     As designed, Defendants' products are not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

75.     Adults frequently set up user accounts on Defendants' social media products posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking.

76.     Minor users of social media and their parents do not reasonably expect that prurient adults

set up fraudulent accounts on Defendants' social media products and pose as minors for malign purposes.

77.     Reasonably accurate age and identify verification is not only feasible but widely deployed by on-line retailers and internet service providers.

78.     The cost of incorporating age and identify verification into Defendants' products would be negligible whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products.

**C.  Inadequate Parental Control and Monitoring**

79.     Defendants' products are also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

**D.  Intentional Direction of Minor Users to Harmful and Exploitative Content**

80.     Default "recommendations" communicated to new teenage users, including Selena Rodriguez, purposefully steered her toward content Defendants knew to be harmful to children of her age and gender.

**E.  Inadequate Protection of Minors from Sexual Exploitation and Abuse**

81.     Defendants' products are not reasonably safe because they do not protect minor users from sexually explicit content and images or report sex offenders to law enforcement or allow users' parents to readily report abusive users to law enforcement.

82.     Parents do not expect their children will use Defendants' products to exchange sexually explicit content and images and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

83.     Minor users of Defendants' products lack the cognitive ability and life experience to identify on-line grooming behaviors by prurient adults and psychosocial maturity to decline invitations to exchange salacious material.

84.     Defendants' products are unreasonably dangerous and defective as designed because they allow minor children to use "public" profiles, in many cases default "public" profiles, that can be mass messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation, and grooming, including the sending of encrypted, disappearing messages and cash rewards through Defendants' integrated design features.

## F.   Design of Addictive Social Media Products

85.     As designed, Defendants' social media products are addictive to minor users as follows: When minors use design features such as "likes" it cause their brains to release dopamine, which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological base line to trigger minor users' dopamine responses increases, they continue to use Instagram, not for enjoyment, but simply to feel normal. Once they stop using Defendants' social media products, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

86.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders.  Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition.

87.     The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

      a.   Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible (sadness, anxiety, irritability).

b.   Tolerance, the need to spend more time using social media to satisfy the urge.

c.   Inability to reduce social media usages, unsuccessful attempts to quit gaming.

d.   Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

e.   Continuing to use social media despite problems.

f.   Deceiving family members or others about the amount of time spent on social media.

g.   The use of social media to relieve negative moods, such as guilt or hopelessness; and

h.   Jeopardizing school or work performance or relationships due to social media usage.

88.   Defendants' advertising profits are directly tied to the amount of time that its users spend online, and their algorithms are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative.  Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that on-line social media platforms are psychologically and neurologically addictive.

89.   It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost.  This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

**G.  Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

90.   Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants know to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns.

91.   It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time.  It is feasible for Defendants to design products that

identify a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

92.     Defendants' products are not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Defendants have not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents when their children have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users. Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants' data and algorithms to identify and restrict improper sexual solicitation, exploitation, and abuse by adult users.

93.     It is reasonable for parents to expect that platforms such as Instagram, which actively promote their services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

94.     As a result of these dangerous and defective design attributes of Defendants' products, Selena Rodriguez suffered severe mental harm, leading to physical injury, from her use of Instagram and Snapchat.

95.     As a result of these dangerous and defective design attributes of Defendants' products, Selena Rodriguez has suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

96.     As a result of these dangerous and defective design attributes of Defendants' products, Plaintiff Tammy Rodriguez has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

97.     Defendants are further liable to Plaintiff for punitive damages based upon the willful and wanton design of their products that were intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram and Snapchat.

//

//

1

## COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)

2

3

98.     Plaintiff realleges each and every allegation contained in paragraphs 1 through 98 as if fully stated herein.

4

5

6

99.     Defendants' social media products rely on highly complex and proprietary algorithms that are both undisclosed and unfathomable to ordinary consumers who do not expect that social media platforms are physically and/or psychologically addictive.

7

8

9

100.     The magnitude of harm from addiction to Defendants' products is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

10

11

12

13

101.     The harms resulting from minors' addictive use of social media platforms have been not only well documented in the professional and scientific literature, but Meta had actual knowledge of such harms.  On information and belief, Snap also has conducted internal studies documenting the addictive quality and harmful effects of its social media products on minor users.

14

15

16

17

18

19

20

102.     Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours.  Excessive screen time is harmful adolescents' mental health and sleep patterns and emotional well-being.  Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

21

22

23

24

25

103.     It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost. This would enable parents to track the frequency, time and duration of their minor child's social media use and identify and address problems arising from such use in the  exercise of their rights and responsibilities as parents.

26

27

28

104.     Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the products reasonably safe during ordinary and foreseeable use by children.

105.    As a result of Defendants' failure to warn, Selena Rodriguez suffered severe mental harm, leading to physical injury, from her use of Instagram and Snapchat.

106.    As a result of Defendants' failure to warn, Selena Rodriguez has suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

107.    As a result of Defendants' failure to warn, Plaintiff Tammy Rodriguez has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

108.    Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton failure to warn of known dangers of their products that were intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Instagram and Snapchat.

### COUNT III – NEGLIGENCE (Common Law)

109.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 109 as if fully stated herein.

110.    At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products, such as Selena Rodriguez

111.    Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters. Defendants intentionally designed and marketed their social media platforms to be both attractive and harmful to underage users, sometimes referred to an "attractive nuisance." Rather than take reasonable precautions to prevent children from harmful and problematic behaviors, Defendant intentionally designed its platforms to attract and addict vulnerable child users.

112.    As California product manufacturers marketing and selling products to residents of Connecticut, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and sale of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

113.    As business owners, Defendants owe their users—who visit Defendants' social media platforms and from whom Defendants derive billions of dollars per year in advertising revenue—

114.    a duty of ordinary care substantially similar to that owed by physical business owners to their business invitees. Defendant Meta has acknowledged that it considers itself to be a digital premises owner by changing its name to Meta, in reference to the "metaverse," and likening its platforms to physical places where it intends for its users to visit for Meta's financial gain.

115.    Defendants were negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like Selena Rodriguez, using their Instagram and Snapchat products.

116.    Defendants were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of their products and levels of problematic use amongst teenage users. Defendants' have extensive internal research indicating that their products are harmful, cause extensive mental harm, and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

117.    Defendants were negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use their social media platforms and features.

118.    Defendants were negligent in failing to fully assess, investigate, and restrict the use of Instagram and Snapchat by adults to sexually solicit, abuse, manipulate, and exploit minor users of their Instagram and Snapchat products.

119.    Defendants were negligent in failing to provide users and parents the tools to ensure their social media products were used in a limited and safe manner by underage users.

120.    As a result of Defendants' negligence, Selena Rodriguez suffered severe mental harm, leading to physical injury and death, from her use of and exposure to Instagram and Snapchat.

121.    As a result of Defendants' negligence, Selena Rodriguez suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

//

122.    As a result of Defendants' negligence, Plaintiff Tammy Rodriguez has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

123.    Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton conduct toward underage users, including Selena Rodriguez, whom they knew would be seriously harmed through the use of Instagram and Snapchat.

## COUNT IV – VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW C al. Bus. & Prof Code §§ 17200, *et seq.*

124.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 123 as if fully stated herein.

125.    Defendants are each a "person" as defined under California Business & Professions Code § 17201.

126.    The UCL prohibits all conduct that is unlawful, unfair, or fraudulent.

127.    Defendants' conduct is unlawful as set forth in Counts I-III, above.

128.    Defendants engaged in fraudulent and deceptive business practices in violation of the UCL by promoting products to underage users, including Selena Rodriguez, while concealing critical information regarding the addictive nature and risk of harm these products pose.  Defendants knew and should have known that their statements and omissions regarding the addictive and harmful nature of their products were misleading and therefore likely to deceive the members of the public who use Defendants' products and who permit their underage children to use Defendants' products.  Had Plaintiff known of the dangerous nature of Defendants' products, she would have taken early and aggressive steps to stop or limit her daughter's use of Defendants' products.

129.    Defendants' practices are unfair and violates the UCL because they offend established public policy, and because the harm these practices cause to consumers greatly outweighs any benefits associated with them.

130.    Defendants' conduct has resulted in a substantial injury that Plaintiff could not reasonably have avoided because of Defendants' deceptive conduct.  This substantial harm is  not outweighed by any countervailing benefits to consumers or competition.

//

131.    As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the UCL described in herein.  As a direct and proximate result of the foregoing acts and practices, Defendants have also obtained an unfair advantage over similar businesses that have not engaged in such practices.

132.    As a result of Defendants' UCL violations, Plaintiff suffered an injury in fact and lost money as set forth above and detailed in her prayer for relief.

133.    Accordingly, Plaintiff seeks injunctive and equitable relief to halt and remedy Defendants' unlawful, fraudulent, and unfair conduct.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

134.    WHEREFORE, Plaintiff prays for judgment against Defendant for relief as follows:

135.    Past physical and mental pain and suffering of Selena Rodriguez, in an amount to be more readily ascertained at the time and place set for trial;

136.    Loss of enjoyment of life, in an amount to be more readily ascertained at the time and place set for trial;

137.    Past medical care expenses for the care and treatment of the injuries sustained by Selena Rodriguez, in an amount to be more readily ascertained at the time and place set for trial.

138.    Past and future impairment to capacity to perform everyday activities;

139.    Plaintiffs' pecuniary loss and loss of Selena Rodriguez's services, comfort, care, society and companionship to Tammy Rodriguez;

140.    Loss of future income and earning capacity of Selena Rodriguez;

141.    Punitive damages;

142.    Injunctive relief, including but not limited to ordering Defendants to stop the harmful

conduct alleged herein, remedy the unreasonably dangerous algorithms in their social media products and provide warnings to minor users and their parents that Defendants' social media products are addictive and pose a clear and present danger to unsuspecting minors.

143.    Reasonable costs and attorney and expert/consultant fees incurred in prosecuting this action; and

144.    Such other and further relief as this Court deems just and equitable.

Dated:  January 20, 2022                      ANDRUS ANDERSON LLP

By:     */s/ Jennie Lee Anderson*
             Jennie Lee Anderson

Jennie Lee Anderson (SBN 203586)
jennie@andrusanderson.com
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA  94104
Telephone: (415) 986-1400
Facsimile: (415) 986-1474

SOCIAL MEDIA VICTIMS LAW CENTER PLLC
By:     */s/ Matthew Bergman*
             Matthew Bergman,

Matthew Bergman
(*Pro Hac Vice application forthcoming*)
matt@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862
Facsimile:  (206) 957-9549

COMPLAINT