1  Jennie Lee Anderson (SBN 203586)
   jennie@andrusanderson.com
2  ANDRUS ANDERSON LLP
   155 Montgomery Street, Suite 900
3  San Francisco, CA  94104
   Telephone:    (415) 986-1400
4  Facsimile:    (415) 986-1474

5  Matthew P. Bergman, *pro hac vice*
   matt@socialmediavictims.org
6  Laura Marquez-Garrett, SBN 221542
   laura@socialmediavictims.org
7  SOCIAL MEDIA VICTIMS LAW CENTER
   821 Second Avenue, Suite 2100
8  Seattle, WA 98104
   Telephone:    (206) 741-4862
   Facsimile:    (206) 957-9549
9
   *Attorneys for Plaintiff*
10
                    UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
11                    SAN FRANCISCO DIVISION

12 TAMMY RODRIGUEZ, individually and as
   the Personal Representative of the Estate of
13 Selena Rodriguez,                              NO.  3:22-cv-0401-JD

14                Plaintiff,                       SECOND AMENDED COMPLAINT
                                                  FOR WRONGFUL DEATH AND
15        v.                                      SURVIVORSHIP, AND FOR
                                                  VIOLATIONS OF THE CALIFORNIA
16 META PLATFORMS, INC., formerly known          UNFAIR COMPETITION LAW, BUS.
   as FACEBOOK, INC.;                             & PROF. CODE §§17200, *ET. SEQ*
17 SNAP, INC.;
   TIKTOK, INC.;                                  JURY DEMAND
18 BYTEDANCE, INC.;

19                Defendants.

20

21

22

23

SECOND AMENDED COMPLAINT FOR WRONGFUL              SOCIAL MEDIA VICTIMS
DEATH AND SURVIVORSHIP - 1                         LAW CENTER PLLC
NO. 3:22-cv-0401-JD                                821 SECOND AVENUE, SUITE 2100
                                                   SEATTLE, WA 98104
                                                   (206) 741-4862

In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways. . . . Technology companies must step up and take responsibility for creating a safe digital environment for children and youth. Today, most companies are not transparent about the impact of their products, which prevents parents and young people from making informed decisions and researchers from identifying problems and solutions.

*Protecting Youth Mental Health*, United States Surgeon General Advisory, December 7, 2021

Plaintiff Tammy Rodriguez, individually and as the Personal Representative of the Estate of Selena Rodriguez, brings this action against Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta"), doing business as Instagram ("Instagram"), Snap, Inc., doing business as Snapchat ("Snapchat"), TikTok, Inc. and ByteDance, Inc. (collectively, "TikTok") and alleges as follows:

## I.    INTRODUCTION

1.      This product liability action seeks to hold Defendants' products responsible for causing and contributing to the burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Defendants and, specifically, for the wrongful death of 11-year-old Selena Rodriguez caused by her addictive use of and exposure to Defendants' unreasonably dangerous and defective social media products. On July 21, 2021, after struggling with the harmful effects of social media, Selena took her own life.

2.      Selena Rodriguez's death was a symptom of the current mental health crisis among American youth caused by social media. On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. Between 2007 and 2018, for example, suicide rates among youth ages twelve to sixteen in the U.S. increased a staggering 146 percent!

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 2
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

3.      The most significant and far-reaching change to the lives of young people during this period was the widespread adoption of mobile social media platforms, most prominently the Instagram, Snapchat, and TikTok products designed and distributed by Defendants. By 2014, 80 percent of high school students said they used a social media platform daily, and 24 percent said that they were online "almost constantly." Millions of children and teenagers spend hours throughout the day and night using Defendants' unreasonably dangerous and defective social media products.

4.      Peer reviewed studies and the available medical science have identified social media use associated with major mental health injuries among youth, including depression, self-harm, eating disorders, suicide attempts and ideation, dissatisfaction with life, depression, and sleep deprivation. Both large observational studies and experimental results point to the heavy use of Defendants' social media products as a cause of increased depression, suicidal ideation, and sleep deprivation among minors, particularly teenage girls.

5.      Defendants' own research also points to their social media products as a cause of increased depression, suicidal ideation, sleep deprivation, and other serious harms. Meta researchers, for example, found that Instagram is "worse" than many competitor products and "is seen as having the highest impact [on negative body and appearance comparison], although TikTok and Snapchat aren't far behind."

6.      Defendants have invested billions of dollars to intentionally design and develop their products to encourage, enable, and push content to children and teenagers that Defendants know to be problematic and highly detrimental to their minor users' mental health.

7.      Internal, non-public data collected by Instagram and Facebook reveal large numbers of its users are engaging in "problematic use" of its products. This problematic use

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 3
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

identified in the medical literature is precisely the type of use Defendants have designed their products to encourage through psychological manipulation techniques—sometimes referred to as persuasive design—that is well-recognized to cause all the hallmarks of clinical addiction.

8.      Likewise, each of Defendants' products contains unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of Defendants' minor users.

9.      Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minor users in particular. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

10.     Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms and sexual abuse arising from foreseeable use of their social media products. The addictive quality of Defendants' products and the impacts of their harmful algorithms are unknown to minor users and their parents.

11.     Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew, or in the exercise of ordinary care should have known, that their social media products were harmful to a significant percentage of their minor users and failed to redesign their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products.

12.     Many of Defendants' own former and/or current developers do not allow their own

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 4
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

children and teenagers to use Defendants' products. For many years, Defendants have had actual knowledge that their social media products are dangerous and harmful to children and teenagers, but actively concealed these facts from the general public and government regulators and failed to warn parents about this known harm for continued economic gain.

13.    Plaintiff brings claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, §§17200, *et seq*. The conduct and omissions alleged herein constitute unlawful, unfair, and/or fraudulent business practices prohibited by the UCL.

14.    Finally, Plaintiff brings claims under 47 U.S.C. § 1595 based on Defendants' financial benefit derived from knowingly assisting, supporting, and facilitating the sexual solicitation and exploitation of Selena Rodriguez and similarly situated children. Defendants have actual knowledge of, and knowingly benefit from, the large number of adult predators who regularly use Defendants' platforms to solicit and groom minor users to engage in commercial sex acts with minors

15.    Defendants have actual knowledge that adult predators use their social media platforms to facilitate commercial sex acts, yet have purposefully failed to undertake reasonable efforts to redesign their social media products to protect minor users such as Selena Rodriguez from sex abuse; failed to warn minor users and their parents that sexual predators are using their platforms to recruit minors to perform commercial sex acts; and failed to notify law enforcement despite knowledge of illegal sex acts performed on and through their platforms.

## II.    PARTIES

16.    Plaintiff Tammy Rodriguez is an individual residing in Enfield, Connecticut, and has been appointed the administrator of the Estate of her daughter Selena Rodriguez, who died of suicide on July 21, 2021.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 5
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

17.     Plaintiff Tammy Rodriguez has not entered into a User Agreement or other contractual relationship with any of the Defendants herein in connection with Selena Rodriguez's use of their social media products. As such, in prosecuting this action Plaintiff is not bound by any arbitration, forum selection, choice of law, or class action waiver set forth in said User Agreements. Additionally, as Personal Representative of the Estate of Selena Rodriguez, Plaintiff expressly disaffirms any and all User Agreements with Defendants that her daughter may have entered into.

18.     Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Instagram social media platform, an application that is widely available to users throughout the United States.

19.     Defendant Snap, Inc. is a Delaware corporation with its principal place of business in Santa Monica, CA. Defendant Snap owns and operates the Snapchat social media platform, an application that is widely marketed by Snap and available to users throughout the United States.

20.     Defendant TikTok, Inc. is a California corporation with its principal place of business in Culver City, CA. Defendant TikTok owns and operates the TikTok social media platform, an application that is widely marketed by TikTok and available to users throughout the United States.

21.     Defendant ByteDance Inc. is a Delaware corporation with its principal place of business in Mountain View, CA. Defendant ByteDance owns TikTok, Inc., and owns/operates the TikTok social media platform.

### III.     JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 6
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

different states. Venue is proper in this District under 28 U.S.C. § 1391(b)(2)

23.     This Court has personal jurisdiction over Defendants because they are each headquartered and have their principal place of business in the State of California. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants Meta and ByteDance's principal places of business are in the Northern District of California and Defendants Snap, Inc. and TikTok are residents of the State of California.

## IV.     DIVISIONAL ASSIGNMENT

24.     The case is properly assigned to the San Francisco Division pursuant to Civ. L. R. 3-2(c)–(d) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in San Mateo County, where Defendants Meta Platforms, Inc. and ByteDance maintain their primary place of business.

## V.     FACTUAL ALLEGATIONS

### A.     Meta Background

25.     Facebook is an American online social network service that is part of the Defendant Meta Platforms. Facebook was founded in 2004 and became the largest social network in the world, with nearly three billion users as of 2021, and about half that number were using Facebook every day. The company's headquarters are in Menlo Park, California.

26.     Instagram is a photo sharing social media application that originally enabled users to post and share photos that could be seen by other users who "follow" the user. A user's followers could "like" and post comments on the photos. Instagram was purchased by Facebook, Inc. for approximately $1 billion in 2012.

27.     Facebook recently changed its name to, and is referred to herein and collectively with Instagram, as Meta.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 7
NO. 3:22-cv-0401-JD

28.     A user's "feed" is comprised of a series of photos and videos posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram. Meta exerts control over a user's Instagram "feed," including through certain ranking mechanisms, escalation loops, and/or promotion of advertising and content specifically selected and promoted by Meta based on, among other things, its ongoing planning, assessment, and prioritization of the types of information most likely to increase user engagement. In the case of minor users, this translates to Meta's deliberate and repeated promotion of harmful and unhealthy content, which Meta knows or has reason to know is causing harm to its minor users.

29.     Instagram also features a "discover" feature where a user is shown an endless feed of content that is selected by an algorithm designed by Meta based upon the users' demographics and prior activity in the application. Meta has designed its product in a manner such that it promotes addictive use and harmful and/or unhealthy content. Meta is aware of these inherently dangerous product features and has repeatedly decided against changing them and/or implementing readily available and relatively inexpensive safety measures, for the stated purpose of ensuring continued growth, engagement, and revenue.

30.     Users' profiles on Instagram may be public or private.  On public profiles, any user is able to view the photos, videos, and other content posted by the user. On private profiles, the users' content may only be viewed by the user's followers, which the user is able to approve. During the relevant period, Instagram profiles were public by default and Instagram allowed all users to message and send follow request to underage users, including Selena Rodriguez.

31.     Defaulting profiles to public served no critical purpose in terms of product functionality and/or a user's ability to access content. Instead, this product feature increased user engagement during onboarding (when a user first starts using Instagram) by increasing user

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 8
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

connections. However, Meta also has actual knowledge that harmful and/or undesirable, even dangerous, contacts could be made through this public setting feature, particularly for users under the age of 18, including Selena Rodriguez.

32.     During the last five years, Instagram has added features and promoted the use of short videos and temporary posts. The latter are referred to as "Reels" while the former is referred to as Instagram "Stories."

33.     Instagram creates images and GIFs for users to incorporate into their videos and picture postings. Instagram has also acquired publishing rights to thousands of hours of music which it provides to its users to attach to the videos and pictures that they post on Instagram. These GIFs, images, and music supplied and created by Instagram frequently make a material contribution to the creation or development of its users' Instagram posts. Indeed, in many cases, the *only* content in a user's Instagram post is the image, GIF, or music supplied by Instagram. When users' GIFs and music supplied by Instagram make a material contribution to the creation and/or development of its users' postings, Instagram becomes a co-publisher of such content. These GIFs, images, and music created by Instagram frequently enhance the psychic harm and defamatory sting that minor users experience from malign third-party postings on Defendant's platform.

34.     Based on individualized data collected from their users' social media habits, the social media activity of users' friends and cohorts, and surreptitious monitoring of users online and offline, Instagram independently selects content for its users and notifies them of such content through text and email. Instagram's notifications to individual users are specifically designed to and do prompt users to open Instagram and view the content selected by Instagram which increases the users' screen time and resulting profits to Instagram.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 9
NO. 3:22-cv-0401-JD

Social Media Victims
Law Center PLLC
821 Second Avenue, Suite 2100
Seattle, WA 98104
(206) 741-4862

35.     Meta has developed artificial intelligence technology that detects adult users of Instagram who both send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes Meta with actual knowledge that a significant number of minor users of Instagram are solicited to send, and actually do send, sexually explicit photos and videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1)-(2).

36.     Over time, Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen—meaning that 72 percent of America's youth use Instagram. Instagram's president Adam Mosseri testified under oath on December 8, 2021, that Instagram is not addictive. This is untrue.

**B.     Snapchat Background**

37.     Snapchat is a photo and short video sharing social media application that allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. The Snapchat product is well-known for its self-destructing content feature. Specifically, the Snapchat product allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients.

38.     Snapchat's self-destructing content design feature is specifically intended to appeal to minor users by evading parents' ability to monitor their children's social media activity and thwart the exercise of their parental responsibility. Snapchat's self-destructing content design feature permits minor users to exchange harmful, illegal, and sexually explicit images with adults and provides sexual predators with a safe and efficient vehicle to recruit victims.

39.     Snapchat also features a series of rewards including trophies, streaks, and other signals of social recognition similar to the "likes" metrics available across other platforms. These

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 10
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

features are designed to encourage users to share their videos and posts with the public. Snapchat designed these features to be addictive, and they are. Users also have an "Explore" feed that displays content created by other users around the world. All of these product features are designed to grab and keep users' attention for as long as possible each day, and have led many people, from psychologists to government officials, to describe Snapchat as "dangerously addictive." Snapchat was founded in 2011 by current president and CEO Evan Spiegel and several other co-founders while they were attending Stanford University.

40.     In 2014, Snapchat added "Stories" and "Chat" features that allowed users to post longer stories that could be viewed by users outside the user's friends. In 2014, Snapchat also released a feature called Snapcash that allowed users to send money to other users without regard to user age, identify verification, and/or parental consent.

41.     Snapchat allows users to enable the sharing of their location, through a tool called Snap Map, which allows the users' followers (and the public for Snaps submitted by the users) to see the user's location on a map. This feature is available to all users, including minors.

42.     Snapchat has developed images for users to decorate the pictures or videos they post. Snapchat has also developed Lenses which are augmented reality-based special effects and sounds for users to apply to pictures and videos they post on Snapchat, and World Lenses to augment the environment around posts. Snapchat also has acquired publication rights to music, audio, and video content that its users can incorporate in the pictures and videos they post on Snapchat.

43.     These images, Lenses, and licensed audio and video content supplied and created by Snapchat frequently make a material contribution to the creation or development of the user's Snapchat posts. Indeed, in many cases, the *only* content in a user's Snapchat post are images,

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 11
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

Lenses, and licensed audio and video content supplied and created by Snapchat. When users incorporate images, Lenses, music, audio, and video content supplied by Snapchat posts, Snapchat makes a material contribution to the creation and/or development of their Snapchat postings and becomes a co-publisher of such content. When malign users incorporate images, Lenses, music, audio, and video content supplied by Snapchat to their posts, this enhances the psychic harm and defamatory sting that minor users experience from third-party postings on Defendant's platform.

44.     By 2015, Snapchat had over 75 million monthly active users and was considered to be the most popular social media application amongst American teenagers in terms of number of users and time spent using the platform.

45.     Snap has developed artificial intelligence technology that detects adult users of Snapchat who send sexually explicit content to children and receive sexually explicit images from children. This technology furnishes Snap with actual knowledge that a significant number of minor users of Snapchat are solicited to send, and actually do send, sexually explicit photos and videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1)-(2).

C.     **TikTok Background**

46.     TikTok is a video sharing social media application where users create, share, and view short video clips.

47.     Users on TikTok who open the TikTok application are automatically shown an endless stream of videos selected by an algorithm developed by TikTok to show content on the "For You" section based upon the user's demographics, likes, and prior activity on the app.

48.     TikTok has designed its algorithms to addict users and cause them to spend as much time on the application as possible through advanced analytics that create a variable reward system tailored to users' viewing habits and interests.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 12
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

49.     There are four main goals for TikTok's algorithm, which the company translates as: "user value," "long-term user value," "creator value," and "platform value."

50.     An internal TikTok document was leaked, which is titled "TikTok Algo 101." On information and belief, it was created by TikTok's engineering team in Beijing and offers both details about the application's mathematical core and insight into the company's understanding of human nature. The document frankly explains that in the pursuit of the company's "ultimate goal" of adding daily active users, it has chosen to optimize for two closely related metrics in the stream of videos it serves: "retention"—that is, whether a user comes back—and "time spent." The document offers a rough equation for how videos are scored, in which a prediction driven by machine learning and actual user behavior are summed up for each of three bits of data: likes, comments, and playtime, as well as an indication that the video has been played.

51.     A recent Wall Street Journal report revealed how TikTok relies heavily on how much time users spend watching each video to steer them toward more videos that will keep them scrolling, and that process can sometimes lead young viewers down dangerous rabbit holes, in particular toward content that promotes suicide or self-harm.

52.     TikTok also features and promotes various "challenges" where users film themselves engaging in behavior that mimics and "one-ups" other users posting videos related to a particular challenge. TikTok promotes users creating and posting videos of challenges identified by a system of hashtags that are promoted within TikTok's search feature.

53.     TikTok has a "For You" section of its platform whereby TikTok videos are funneled to users based on secret criteria. An internal document recently leaked to the New York Times revealed TikTok's policy to exclude videos of poor, disabled, or unattractive users. Under this policy, TikTok moderators were explicitly told to suppress uploads from users with flaws both

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 13
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

congenital and inevitable. "Abnormal body shape," "ugly facial looks," dwarfism, "obvious beer belly," "too many wrinkles," "eye disorders," and many other "low quality" traits are to be excluded. Videos in which "the shooting environment is shabby and dilapidated," including but "not limited to … slums, rural fields" and "dilapidated housing" were also systematically hidden from new users. The document advised TikTok's moderators that for videos shot in someone's house with "no obvious slummy charactor [sic]," special care should be given to check for "slummy" features such as a "crack on the wall" or "old and disreputable decorations."

54.     TikTok purports to have a minimum age requirement of 13 years old but does little to verify users' age or enforce its age limitations despite its knowledge that use by underage users is widespread.

55.     Until mid-2021, TikTok by default made all users' profiles "public," meaning that strangers, often adults, could view and message underage users of the TikTok application.

56.     TikTok exclusively controls and operates the TikTok platform for profit, which like Instagram and Snapchat, creates advertising revenue through maximizing the amount of time users spend on their platforms.

57.     TikTok does not seek parental consent for underage users or provide any warnings or controls that would allow parents to monitor and limit the use of TikTok by their children.

58.     TikTok has also developed GIFs, memes, music, and images for users to apply to images they post on TikTok. TikTok also has acquired publication rights to music that its users can incorporate in the pictures and videos they post on TikTok. Images, GIFs, memes, and music supplied by TikTok frequently make a material contribution to the creation and/or development of users' postings, making TikTok a co-publisher of such content. These images and memes supplied by TikTok frequently enhance the psychic harm and defamatory sting that minor users experience

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 14
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

1  from malign third-party postings on Defendant's platform.

2      59.    TikTok has developed artificial intelligence technology that detects adult users of

3  TikTok who send sexually explicit content to children and receive sexually explicit content from

4  children. This technology furnishes TikTok with actual knowledge that a significant number of

5  minor users of Instagram are solicited to send and actually do send sexually explicit photos and

6  videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1)-(2).

7      60.    TikTok is highly integrated with its Chinese parent, ByteDance. TikTok's

8  engineering manager works on both TikTok and ByteDance's similar Chinese app, Douyin.

9  TikTok's development processes are closely intertwined with Douyin's process. TikTok

10 employees are also deeply interwoven into ByteDance's ecosystem. They use a ByteDance

11 product called Lark, a corporate internal communications system like Slack but with aggressive

12 performance-management features aimed at forcing employees to use the system more.

13 **D.    Defendants' Applications Are Products**

14     61.    Instagram, Snapchat, and TikTok are products that are designed and manufactured

15 by Meta, Snap, and TikTok, respectively. These products are designed to be used by children and

16 are actively marketed to children throughout the world.

17     62.    Defendants' products are designed to be used by minors and are actively marketed

18 to minors across the United States. Defendants market to minors through their own marketing

19 efforts and design. But also, Defendants work with and actively encourage advertisers to create

20 ads targeted at and appealing to teens, and even to children under the age of 13. Defendants spend

21 millions of dollars researching, analyzing, and experimenting with young children to find ways to

22 make their products more appealing and addictive to these age groups, as these age groups are

23 seen as the key to Defendants' long-term profitability and market dominance.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 15
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

63.     Defendants are aware that large numbers of children under the age of 18 use their products without parental consent. They design their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, their own profits.

64.     Defendants are aware that large numbers of children under the age of 13 use their products despite user terms or "community standards" that purport to restrict use to individuals who are 13 and older. They have designed their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, their own profits.

**E.     Defendants' Business Model is Based on Maximizing User Screen Time**

65.     Defendants advertise their products as "free," because they do not charge their users for downloading or using their products. What many users do not know is that, in fact, Defendants make a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to their users. Defendants receive revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications. Defendants also receive revenue from selling their users' data to third parties.

66.     The amount of revenue Defendants receive is based upon the amount of time and level of user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user.

67.     Defendants use unknown and changing rewards that are designed to prompt users who consume their social media products in excessive and dangerous ways. Defendants know, or in the exercise of ordinary care should know, that their designs have created extreme and addictive usage by their minor users, and Defendants knowingly or purposefully designed its products to encourage such addictive behaviors. For example, all the achievements and trophies in Snapchat are unknown to users. The Company has stated that "[y]ou don't even know about the achievement

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 16
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

until you unlock it." This design conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time.

68.     This design is akin to a slot machine but marketed toward minor users who are even more susceptible than gambling addicts to the variable reward and reminder system designed by Snapchat. The system is designed to reward increasingly extreme behavior because users are not actually aware of what action will unlock the next award.

69.     Instagram, like Snapchat and TikTok, is designed around a series of features that do not add to the communication utility of the application, but instead seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards, including "likes" and "followers." In the hands of children, this design is unreasonably dangerous to the mental well-being of underage users' developing minds.

70.     According to industry insiders, Defendants have employed thousands of psychologists and engineers to help make their products maximally addicting. For example, Instagram's "pull to refresh" is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry and prevent natural end points that would otherwise encourage users to move on to other activities.

71.     Defendant do not warn users of the addictive design of their product. On the contrary, Defendants actively try to conceal the dangerous and addictive nature of their products, lulling users and parents into a false sense of security. This includes consistently playing down their products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make their research public or available to academics or lawmakers who have asked for it.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 17
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

72.     For example, in or around July 2018, Meta told BBC News that "at no stage does wanting something to be addictive factor into" its product design process. Similarly, Meta told U.S. Senators in November 2020 that "We certainly do not want our products to be addictive." Yet, Meta product managers and designers attend an annual conference held in Silicon Valley called the Habit Summit, the primary purpose of which is to learn how to make products more habit-forming.

73.     Defendants engineer their products to keep users, and particularly young users, engaged longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories.

74.     Internal Meta documents identify the potential of reduction in usage by their minor users as an "existential threat" to their business and spend billions of dollars per year marketing their products to minors.  Defendants have deliberately traded in user harm to protect the revenue stream their products generate.

**F.     Defendants Have Designed Complex Algorithms to Addict Teen Users.**

75.     Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to three of the largest technology companies in the world.

76.     Defendants' algorithms select content for minor users not based on what they anticipate the user will prefer or to enhance their social media experience, but rather for the express purpose of habituating users to the Defendants' social media products. Defendants' algorithms do not provide a neutral platform but rather specify and prompt the type of content to be submitted and determine particular types of content its algorithms promote.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 18
NO. 3:22-cv-0401-JD

77.     Defendants designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use.

78.     One of these features—present in Snapchat, Instagram, and TikTok—is the use of complex algorithms to select and promote content that is provided to users in an unlimited and never-ending "feed." Defendants are well aware that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health—however, this type of use allows Defendants to display more advertisements and obtain more revenue from each individual user.

79.     Defendants know that content that generates extreme psychological reactions in minor users is more likely to trigger their engagement than content that is benign. Defendants have designed algorithm-controlled feeds to promote content most likely to increase user engagement, which often means content that Defendants know to be psychologically stressful to their users. Content is selected not just based on individual users' viewing history but also on the viewing history of their linked friends. Users are exposed to content that they would otherwise never see but for Defendants' affirmative pushing of such content to their accounts.

80.     The addictive nature of Defendants products and the complex and psychologically manipulative design of their algorithms is unknown to ordinary consumers, particularly minors.

81.     Defendants go to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making public statements about the safety of their products that simply are not true.

82.     Defendants also have developed unique product features designed to limit, and have in other ways limited, parents' ability to monitor and prevent problematic use by their children.

83.     Defendants' algorithms adapt to promote whatever content will trigger minor users'

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 19
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

engagement and maximize their screen time. Defendants' algorithm designs do not distinguish, rank, discriminate, or prioritize between particular content based on whether it is helpful or harmful to the psychic well-being of their minor users. Once a minor user engages with abusive, harmful, or destructive content, Defendants' algorithms will direct the minor user to content that is progressively more abusive, harmful, and destructive to maximize the user's screen time.

84.     Defendants' algorithms are not simply tools meant to facilitate the communication and content of others but are content in and of themselves. Defendants' algorithms do not function like traditional search engines that select particular content for users based on user inputs; they direct minor users to content based on far more than the individual users' viewing history. Defendants' algorithms make recommendations not simply based on minor users' voluntary actions but also the demographic information and social media activity of the users' friends, followers, and cohorts. The user data that Defendants' algorithms use to select content therefore encompasses far more information than voluntarily furnished by the particular user and include private information about the user that Defendants discover through undisclosed surveillance of their behavior both online and offline.

**G.     Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

85.     The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

86.     The frontal lobes—and in particular the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC 821 SECOND AVENUE, SUITE 2100 SEATTLE, WA 98104 (206) 741-4862

These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

87.     During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

88.     In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses, emotions, and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

89.     The algorithms in Defendants' social media products are designed to exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, they experience enhanced dopamine responses to stimuli on Defendants' social

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 21
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

media platforms and are therefore much more likely to become addicted to Defendants' products; exercise poor judgment in their social media activity; and act impulsively in response to negative social media encounters. Defendants also know, or in the exercise of reasonable care should know, that minor users of their social media products are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants knowingly designed their social media products to be addictive to minor users and failed to include in their product design any safeguards to account for and ameliorate the psychosocial immaturity of their minor users.

## H.    Defendants Misrepresent the Addictive Design and Effects of their Social Media Products

90.    During the relevant time period, Defendants stated in public comments that their products are not addictive and were not designed to be addictive. Defendants knew or should have known that those statements were untrue.

91.    Neither Instagram, TikTok, or Snapchat warned users or their parents of the addictive and mentally harmful effects that the use of their products was known to cause amongst minor users, like Selena Rodriguez. On the contrary, Defendants have gone to significant lengths to conceal and/or avoid disclosure as to the true nature of their products.

## I.    Plaintiff Expressly Disclaims Any Claim That Defendants Are Liable as the Publisher or Speaker of Any Content Provided, Posted or Created by Third Parties

92.    Plaintiff is not alleging that Defendants are liable for what the third parties said, but for what Defendants did or did not do. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words or content. Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for Defendants' good faith attempts to restrict access to objectionable content.

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

93.     Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, as well as Defendants' own statements and affirmative acts, not as the speaker or publisher of third-party content.

94.     Defendants also failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. These dangers which are unknown to ordinary consumers, do not arise from third-party content contained on Defendants' social media platform but rather from their algorithms' designs that 1) addict minor users to Defendants' products; 2) affirmatively select and promote harmful content to vulnerable users based on their individualized demographic data and social media activity; and 3) put minor users in contact with dangerous adult predators.

95.     Plaintiff's product defect claims arising from Defendants' addictive social media products are content neutral. For example, Defendants design and operate their algorithms in a manner intended to and that does change behavior and addict users, including through a natural selection process that does not depend on or require any specific type of third-party content.

96.     Defendants' product features are designed to be and are addictive and harmful in themselves, without regard to any content that may exist on Defendants' platforms. For example, Meta's "like" feature and Snapchat's "Snapstreaks" are content neutral and based solely on the user's level of activity on Defendants' platforms, not the content of the material they see.

97.     Defendants have designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Defendants' products.

98.     Defendants affirmatively promote, encourage, and/or otherwise contribute to the

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 23
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

development of harmful content. In an October 2021 Senate Hearing it was revealed that Meta documents provided by a whistleblower demonstrate that Defendants promote, encourage, and/or otherwise contribute to the development of harmful content. The Senate hearing revealed that

a. Defendants approve of ads that contain harmful content, for example, "designed to encourage and promote anorexia" and encourage children to abuse prescription or illegal drugs, which ads Defendants then target specifically at children in exchange for payment.

b. Defendants utilize private information of their minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors." Defendants specifically select and push this harmful content, for which they are paid, to increase user engagement. "That's how [defendants] can push teens into darker and darker places." (Senator Blumenthal, October 5, 2022).

c. Defendants "know[] that [their] amplification algorithms, things like engagement based ranking ... can lead children from very innocuous topics like healthy recipes ... all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time." Defendants have knowledge that their products and the content they are encouraging and helping to create is harmful to young users and choose "profits over safety."

99. Defendants have information and knowledge that can determine with reasonable certainty each user's age, habits, and other personal information, regardless of what information the user provides at the time of account setup.

100. Defendants' algorithms identify minor users by age and gender and, on information

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 24
NO. 3:22-cv-0401-JD

Social Media Victims
Law Center PLLC
821 Second Avenue, Suite 2100
Seattle, WA 98104
(206) 741-4862

and belief, race, ethnicity, sexual orientation, and economic status and direct specific content to specific users based upon these factors. User data obtained through Defendants' algorithms, particularly age and gender, affirmatively directs predatory adults to vulnerable minor users. In this way, the Defendant's algorithms promote responses from predatory adult users that violate state and federal law. Because Defendants' social media products themselves generate the options for selecting a user based on predatory criteria, they materially contributed to the unlawfulness of the posted content described herein.

101.    None of Plaintiff's Claims for Relief set forth herein treat Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe social media products and furnish adequate warnings of foreseeable dangers arising out of the use of their products without altering, deleting, or modifying the content of a *single* third-party post or communication.

**J.    Selena Rodriguez Died of Suicide Proximately Caused by Defendants' Defective Social Media Products**

102.    Selena Rodriguez was born on December 13, 2009, and grew up in Chicopee, Massachusetts and Enfield, Connecticut. She was a vivacious child and was loved by her teachers at Lambert-Lavoie Elementary School in Chicopee, Massachusetts and Prudence Crandall Elementary School in Enfield, Connecticut.

103.    When she was nine years old, Selena was given a computer tablet to access the internet. Shortly thereafter, she downloaded Defendants' social media products without her mother's knowledge or consent.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 25
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

104.    Selena's social media use coincided with a decline in her mental health and academic performance. She quickly became addicted to Defendants' products and spent increasing amounts of time communicating on social media. By mid-2021, Selena was on social media at all hours of the day and night and communicating with over 2,500 different individuals, all but a handful of whom were complete strangers to her and many of whom were adult users of Defendants' products.

105.    Selena's mother attempted multiple times to reduce or limit her daughter's use of social media. Because of Selena's addiction to Defendants' products, however, these efforts at exercising Plaintiff's parental rights and authority caused a severe reaction by Selena. Because Defendants' products did not contain or permit parental controls, the only way for Tammy Rodriguez to effectively limit her child's access to Defendants' products was to physically confiscate Selena's internet-enabled devices, which simply caused Selena to self-harm or run away from home in order to access Defendants' products on other devices.

106.    During the Covid-19 pandemic, Selena spent more and more time on Instagram, TikTok, and Snapchat, which only worsened her depression, anxiety, and level of sleep deprivation. By 2021, Selena was communicating on social media throughout the night and would get as little as two hours of sleep a night.

107.    Tammy Rodriguez sought mental health treatment for Selena on multiple occasions. An outpatient therapist who evaluated Selena remarked that she had never seen a patient as addicted to social media as Selena. By the spring of 2021, Selena was experiencing severe sleep deprivation that was caused and aggravated by her addiction to Instagram, Snapchat, and TikTok and the constant 24-hour stream of notifications and alerts sent by Defendants.

108.    As a proximate result of her use of Instagram, TikTok, and Snapchat, and

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 26
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

specifically due to the intentionally addictive nature of these products, Selena Rodriguez had multiple absences from school, which further deprived her of support services and caused the Connecticut Department of Children and Families to investigate.

109.    The Connecticut Department of Children and Families found Tammy Rodriguez to be a responsible and responsive parent, who was seeking to access mental health support services for her struggling daughter.

110.    Prompted in part by Snapchat's "disappearing" message feature and other design features geared toward the promotion of sharing explicit images, Selena sent sexually explicit images using Snapchat, which were subsequently shared or leaked to her classmates, increasing the ridicule and embarrassment she experienced at school.

111.    Through her use of Instagram, TikTok, and Snapchat, Selena was messaged and solicited for sexual exploitive content and acts on numerous occasions by adult male users of Instagram and Snapchat, who are encouraged to use these platforms to sexually solicit and abuse minors due to Defendants' refusal to verify identity and age for new users.

112.    As a proximate result of Selena's addictive, problematic, and sexually exploitative encounters on Instagram, TikTok, and Snapchat, she developed numerous mental health conditions including an eating disorder, self-harm, and physically and mentally abusive behaviors toward her mother and sibling and underwent multiple inpatient psychiatric admissions.

113.    Defendants provided Selena with access to multiple accounts on Defendants' social media platforms without her mother's knowledge or consent.

114.    Defendants possessed actual knowledge that Selena was under the age of 13 and obtained multiple accounts under different usernames, yet failed to restrict her access or notify Plaintiff of her daughter's account status. Plaintiff has only been able to access one account (an

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 27
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

Instagram account) among the numerous Instagram, Snapchat, and TikTok accounts for which

Selena signed up. On information and belief, the data relating to that account resides on Meta's

servers. Moreover, analysis of just some of the messages, photographs, and audio and video

recordings from this single account reveals numerous instances of sexual exploitation and abuse

by adult users, bullying, and depression.

115.    Between March 16 and March 17, 2020, when Selena was only ten years old, she

had the following exchange with an Instagram User, whose username currently is unknown to

Plaintiff but is known to Meta ("Unknown User No. 5"):

> Instagram User
> fck corona virus join my hot snapchat ➡ iamHornyHoney
> Mar 16, 2020, 11:54 AM
>
> Selena Rodriguez
> hi
> Mar 16, 2020, 11:54 AM
>
> Instagram User
> lets have some fun cum play with me on snachat ➤ iamHornyHoney
> Mar 16, 2020, 11:56 AM
>
> Selena Rodriguez
> ok
> Mar 16, 2020, 11:56 AM
>
> Instagram User
> if you wanna trade pics follow me on snapchat ➡ IamHornyHoney
> Mar 16, 2020, 11:57 AM
>
> Selena Rodriguez
> hey
> Mar 16, 2020, 11:57 AM
>
> Instagram User
> if you want to go live with me go add me on snap👉 IamHornyHoney
> Mar 17, 2020, 1:39 AM

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

All references to time are based on information and belief provided from the report the Instagram product itself made available, and on information and belief reflect PST or similar, such that they are three to four hours behind the time it would have been for Selena.

116.    Between April 15 and June 4, 2020, Selena had a series of Instagram exchanges with another Instagram User, whose username currently is unknown to Plaintiff but is known to Meta ("Unknown User No. 6"). Unknown User No. 6 identified himself as an adult male from India. Unknown User No. 6 offered to send Selena "a pick of it [his penis]" in a video call then attempted to initiate a video call multiple times. After Selena responded, "no more," Unknown User No. 6 kept pleading and Selena responded: "NO OR I BLOCK." Unknown User No. 6 responded with the following messages, in rapid succession:

> "Can u send me ur boobs pic"
> "Pls can u send"
> "Show ur boobs"
> "Plz"
> "Show ur pussy"
> "Plz dear"
> "Send pic"
> "I will send u my penis pic"
> "Plz send ur pussy pic"
> "R u sending"

Selena was 10 years old at this time and ultimately succumbed to the bullying of this adult male user and agreed to receive a penis picture from him. He then responded that he would not send it until she sent her "pussy pic."

117.    On June 4, 2020, Unknown User No. 6 and Selena chatted by video at his request and on information and belief, they ultimately exchanged sexually explicit images. Unknown User No. 6 again began asking her to send pictures. Selena sent him a face shot and told him that she just made a "fan page." Plaintiff understands that this means Instagram allowed her to open another

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 29
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

account, with the sole purpose of providing other users with access to her.

118.    Unknown User No. 6 responded, "Can u show me your tites in video call," and Selena sent an audio message: "Okay listen. I am a fan page only and I am young so STOP I'm gonna call you right now."

119.    On March 20, 2021 at 7:07 PM Selena received the following targeted advertisement on her Instagram account:

> Hey! We are looking for ladies to be models and brand ambassadors for our brand!! Please send us a message at our main account @nkdunderwear ASAP and let's talk there

The advertisement linked to an Instagram page promoting NKD Underwear & Apparel, online retailer of adult women's underwear, swimwear, and leisure wear. https://wearnkd.com/pages/about (last visited Apr. 30, 2022).

120.    On June 17, 2021, at 8:42 am, Selena engaged in the following exchange with another Instagram User, whose username currently is unknown to Plaintiff but is known to Meta ("Unknown User No. 59"):

> Unknown User No. 59
> I'm Lewis will you be my sugar baby I will be giving you $300 twice in a week. Let me know if you are interested
> Jun 17, 2021, 8:42 AM
>
> Selena Rodriguez
> No cause I am 12
> Jun 17, 2021, 8:43 AM
>
> Unknown User No. 59
> Okay
> Jun 17, 2021, 8:43 AM
>
> Selena Rodriguez
> Your like 30
> Jun 17, 2021, 8:44 AM
>
> Unknown User No. 59

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

Yes
Jun 17, 2021, 8:44 AM

Selena Rodriguez
You can get arrested
Jun 17, 2021, 8:46 AM

121.     Selena was not able to resist similar entreaties from other adult Instagram users.

Between June 15 and June 27, 2021, she communicated with an Instagram user who goes by the

username "coldwatermage" and received the following message:

Im gonna visit you in august And ill take you shoppin n on cute dates deal
? Selena???
Jun 24, 2021, 12:54 PM

Selena and "coldwatermage" then exchanged a series of disappearing pictures and images. On

information and belief, these exchanges included sexually explicit content.

122.     Selena used Defendants' social media products interchangeably to exchange

sexually explicit content and images with other users, many of whom were over the age of 18. She

would receive a message from an adult user on Instagram telling her to send lewd photos of herself

on Snapchat or TikTok.

123.     On July 16, 2021, Selena was contacted by another Instagram user, whose

username currently is unknown to Plaintiff but is known to Meta ("Unknown User No. 51"), by

sending her an Instagram link and message "yeahh." Plaintiff has been unable to access the content

originally located at that link, but Meta would have such access. On information and belief, these

types of exchanges were ones originating because of Instagram's public profile product feature.

That is, adult Instagram users who did not know Selena in real life were able to find her, and other

young girls, because of Instagram's public profile feature, along with recommendations and other

Instagram features. Once such access was obtained, these adult users would either send her a link

to her own content or to sexually explicit content, along with illicit messages designed to provide

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 31
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

exploit her.

124.    Selena responded to Unknown User No. 51 with "Im 12 sorry" and Unknown User No. 51 replied "Damn well can I at least get a pic". Selena sent Unknown User No. 51 face photographs and a TikTok video of her dancing. Unknown User No. 51 responded: "U got nudes?" Selena replied that she did but that she would not show him.

125.    Between March 19 and March 20, 2021, Selena exchanged a series of messages with an Instagram user who is referred to in an exchanged photo as "fartbrains07." His first message to her was "So Cute". He then started complimenting Selena and Selena realized that this user had previously messaged her friend, H. She sent him a photo of himself naked from the back and said he had a "flat ass." She also told him that she got the photo from her friend, H. The other user then became irritated and sent Selena a photo of H with her shirt up and then a photo of Selena with *her* shirt up and showing part of Selena's face. Selena told him to delete the picture, or she would call the police: "those boobs that got sent the last picture those are mind[sic] so please delete it." He initially said to go ahead and call the police, but then said he would delete Selena's photo, but not H's because "she is not a good girl." Throughout this conversation, every time Selena did not immediately respond, "fartbrains07" became hostile, and his tone turned threatening. Selena told him she was in school. She threatened to block him but never did. "Fartbrains07" asked Selena for an "ass pic" and she said no. He then offered to send her an "ass and dick" picture, and said he thinks she and H are the same person. She denied it. He said, "So see me ur boobs to make sure." When she refused, he threatened to "publish" the photo he had of her with her shirt up and part of her face showing.

126.    These are just a few of many examples of the many types of harmful and illegal behavior that transpired because of Meta's social media product and this one Instagram account.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 32
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

On information and belief, when the data from all of Selena's accounts on Instagram, Snapchat, and TikTok are produced in discovery, they will reveal a more extensive pattern of bullying, sexual abuse, and commercial sex acts as set forth herein.

127.    Between May 26 and June 3, 2021, Selena was hospitalized for suicidal ideation. Her treaters observed excessive social media usage as a factor in her mental distress. At that time, however, the addictive design and harm caused by foreseeable use of Defendants' products, especially to minors, was still not publicly known.

128.    Between June 13 and June 23, 2021, Selena had a series of Instagram and Snapchat exchanges with another user of Defendants' products, who went by the Instagram username "Hxcked_Xccount_101," which included the following:

> Hxcked_Xccount_101: Oh my little lady wanna blow these pipes 7:03 PM
>
> Hxcked_Xccount_101 I see you have liked my posts 7:03 PM

Hxcked_Xccount_101 then left several bizarre (high pitched voice) audio messages for Selena, which include the following,

> Hello, I see that you have liked my posts … [inaudible] if you wanted to blow my pipes, I would love it. And I just wanted to let you know that I am going to blow your balloon. And … [inaudible]." And [inaudible] … please have my pee in your mouth."

129.    Selena responded, "Yes daddy" and sent Hxcked_Xccount_101 sexually explicit Snapchat photos. Then, on information and belief, they stopped chatting on Instagram and moved the discussion to Snapchat. One week later, Instagram texts between Selena and Hxcked_Xccount_101 reveal that he knows her name and talks to her as though they have become very close over a very short time. The day Selena died, Hxcked_Xccount_101 texted her excessively and tried to initiate audio calls. He wrote one letter at a time: S-E-L-E-N-A-P-L-Z-A-

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 33
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

N-S-W-E-R-M-E-R-N, and later that night (likely at 2:45 or 3:45 am on July 22) he wrote "why did you do it" "I loved u so much."

130.    On July 13, 2020, Selena was engaged in a 46-minute video chat on Instagram with a user known only as "Mark." While the call was underway, Selena received two sexually explicit Snapchat photos from "Mark."

131.    On June 16, 2021, Selena sent an Instagram user known as "giggill pig" eight photos. Many are explicit and constitute Child Sexual Abuse Material (known as "CSAM"). Selena can be identified as the subject of those photos based on the background—that is, red lights she had in her room and that can be observed in other, non-explicit photos. The solicited photos, including photos that don't show her face, show the red lights that we see in less explicit photos as being in her bedroom, and the body type matches hers. These photos are very explicit and include some in her underwear and in suggestive positions on her bed, as well as full-body naked and vagina photos.

132.    On June 23, 2021, at 8:39 pm, Selena sent an explicit video to Instagram user "JAY." The image is focused on Selena's genital area and depicts her masturbating. Upon learning of this video, the undersigned law firm made a report to the National Center for Missing & Exploited Children.

133.    The sexual abuse and bullying that Selena sustained through her addiction to Defendants' social media products was a proximate cause of her depression, anxiety, and suicidal ideation. Between May 14 and May 23, 2021, Selena exchanged messages with another Instagram user, a female whose username currently is unknown to Plaintiff but is known to Meta ("Unknown User No. 35").

Instagram User
What's wrong

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 34
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

May 16, 2021, 8:10 PM

Selena Rodriguez
Everything I get bullied I get told to kill myself I get told to cut myself I get told that nobody loves me that I'm a waste of sperm and a mistake
May 16, 2021, 8:11 PM

Instagram User
Omg that's horrible I'm so sorry
May 16, 2021, 8:11 PM

Selena Rodriguez
Its fine
May 16, 2021, 8:11 PM

Instagram User
But people shouldn't be talking to you like that that's not right
May 16, 2021, 8:51 PM

134.    Between April 30 and June 13, 2021, Selena communicated with another Instagram user, whose username currently is unknown to Plaintiff but is known to Meta ("Unknown User No. 30").  On May 1, 2021, Selena wrote to him,

> I am crying i wanna die i feel every one hates me i fight myself every day not to kms because i remember some people love me i self harm i know i sound dramatic and dumb but my depression is so bad and i am just not okay inside

135.    On May 20, 2021, Selena wrote an Instagram to another Instagram user, an 11-year-old boy from Philadelphia, "I hate my life baby I am sorry I almost left." Selena became suicidal and was hospitalized for emergency psychiatric care on May 26, 2021. Upon her return from the hospital, Selena told Unknown User No. 30 on June 9, 2021 "Sorry just got home from Connecticut children's hospital for trying to kms."

136.    On the afternoon of July 21, 2021, while Tammy Rodriguez was at work, Selena accessed her mother's supply of Wellbutrin. She returned to her bedroom, placed her phone on a table, pointed it at herself, and turned on the video camera. Holding two Wellbutrin pills between

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 35
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

her fingers, she looked straight in the camera, tilted her head back, and placed the pills in her mouth. She then took a gulp of soda out of a bottle, looked into the camera, made the "Peace Out" hand gesture and playfully stuck out her tongue. Selena posted her six-second suicide video on Snapchat on which she had incorporated audio from the NF song "Paralyzed" licensed to Snap:

> *I'm paralyzed*
> *Where are my feelings?*
> *I no longer feel things*
> *I know I should*
> *I'm paralyzed*
> *Where is the real me?*
> *I'm lost and it kills me*
> *Inside*
> *I'm paralyzed*

137.    When Tammy Rodriguez returned from work, she found Selena unconscious and barely breathing. She called 911 and Selena was transported to the hospital by ambulance. Physicians were unable to revive her, and she was pronounced dead. The Medical Examiner conducted toxicology reports and found that Selena died of Acute Bupropion Intoxication caused by Suicide. The Medical Examiner report reported that Selena suffered from "Major Depressive Disorder, Anxiety and Attention Deficit Hyperactivity Disorder" noting her recent hospitalization for suicidal ideation.

138.    When Tammy Rodriguez cleaned out Selena's room after her death, Plaintiff found five knives hidden under her bed.

139.    Selena's death was the proximate result of psychic injury caused by her addictive use of Instagram, TikTok, and Snapchat social media products.

140.    Throughout the period of Selena's use of social media, Tammy Rodriguez was unaware of the clinically addictive and mentally harmful effects of Instagram, TikTok, and Snapchat.

SECOND AMENDED COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP - 36
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

141.    Defendants designed Instagram, TikTok, and Snapchat to frustrate and prevent parents like Tammy Rodriguez from exercising her right and duty as a parent to monitor and limit her child's use of their social media products.

142.    Defendants knowingly designed Instagram, TikTok, and Snapchat to enable minor users such as Selena Rodriguez to use, become addicted to, and abuse their products without the knowledge and consent of their parents.

143.    Defendants designed Instagram, TikTok, and Snapchat to be attractive nuisances to users below the age of 13 such as Selena Rodriguez, but failed to exercise ordinary care owed to underage business invitees to prevent the rampant solicitation of underage girls by anonymous older users who do not disclose their real identities, and mass message underage users with the goal of grooming and sexually exploiting minors.

144.    Based on Selena Rodriguez's user history and postings, Defendants possessed actual knowledge that she was below the age of 13; was addicted to their products; and was exchanging sexually explicit images with adult users, yet took no steps to terminate her usage, inform Tammy Rodriguez of her daughter's unauthorized use and sexual exploitation, or notify law enforcement officers.

145.    Defendants not only failed to warn Tammy and Selena Rodriguez of the dangers of addiction, sleep deprivation, sexual abuse, and problematic use of their applications, but affirmatively misrepresented the safety, utility, and addictive properties of their products to minor users and their parents

## VI.    PLAINTIFF'S CLAIMS

## COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

146.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 145

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 37
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

1  as if fully stated herein.

2        147.    Under Restatement (Second) of Torts § 402(a), California and Connecticut law,

3  one who sells any product in a defective condition unreasonably dangerous to the user is subject

4  to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business

5  of selling such a product, and (b) it is expected to and does reach the user or consumer without

6  substantial change in the condition which it was sold.

7        148.    Defendants designed, manufactured, marketed, and sold products that were

8  unreasonably dangerous because they were designed to be addictive to the minor users to whom

9  Defendants actively marketed and because the foreseeable use of Defendants' products causes

10  mental and physical harm to minor users.

11        149.    Defendants' products were unreasonably dangerous because they contained

12  numerous design characteristics that are not necessary for the utility provided to the user but are

13  unreasonably dangerous and implemented by Defendants solely to increase the profits they derived

14  from each additional user and the length of time they could keep each user dependent on their

15  product.

16  **A.    Inadequate Safeguards From Harmful and Exploitative Content**

17        150.    As designed, Snapchat, TikTok, and Instagram algorithms are not reasonably safe

18  because they intentionally direct minor users to harmful and exploitative content while failing to

19  deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible

20  to design an algorithm that substantially distinguishes between harmful and innocuous content and

21  protects minor users from harmful content without altering, modifying, or deleting a *single* third-

22  party posting on Defendants' social media platforms. The cost of designing Defendants'

23  algorithms to incorporate this safeguard would be negligible, while the benefit would be high in

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 38
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

terms of reducing the quantum of mental and physical injury sustained by minor users such as Selena Rodriguez and their families.

151.    Snapchat, TikTok, and Meta also engage in conduct, outside of the algorithms themselves, which is designed to promote harmful and exploitative content as a means of increasing their revenue from advertisements. This includes, but is not limited to, efforts to encourage advertisers to design ads that appeal to minors, including children under the age of 13; and product design features intended to attract and engage minor users to these virtual spaces where harmful advertising content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Defendants at the direct cost of user well-being.

152.    Reasonable users (and their parents) would not expect that Defendants would knowingly direct them to such harmful content, much less in the manipulative and coercive manner that they do. Defendants have and continue to knowingly use their algorithms on minor users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Defendants' youngest users, like Selena Rodriguez.

**B.      Failure to Verify Minor Users' Age and Identity**

153.    As designed, Defendants' products are not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

154.    Adults frequently set up user accounts on Defendants' social media products disguising their identity and/or posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking, and commercial sex acts.

155.    Minor users of social media and their parents do not reasonably expect that prurient

adults set up fraudulent accounts on Defendants' social media products and pose as minors for malign purposes.

156.    Likewise, minor users whose parents have taken affirmative steps to keep them away from Defendants' products often open multiple accounts, such that Defendants know or have reason to know that the user is underage and/or does not have parental permission to use their product. Defendants already have the information and means they need to ascertain with reasonable certainty their users' actual age. Defendants utilize these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They then choose to simply do nothing about that information as it relates to the specific, underaged users themselves.

157.    Reasonably accurate age and identity verification is not only feasible but widely deployed by online retailers and internet service providers. Defendants not only have the ability to estimate the age of their users, but actually do so.

158.    The cost of incorporating age and identify verification into Defendants' products would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products.

## C.    Inadequate Parental Control and Monitoring

159.    Defendants have intentionally designed products to frustrate the exercise of parental responsibility by their minor users' parents. Parents have a right to monitor their children's social media activity to protect them from harm. Defendants have designed products that make it difficult, if not impossible, for parents to exercise parental responsibility.

160.    Defendants' products are also defective for lack of parental controls, permission,

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 40
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

and monitoring capability available on many other devices and applications.

161.    Defendants' products are designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D.    Intentional Direction of Minor Users to Harmful and Exploitative Content**

162.    Default "recommendations" communicated to new minor users, including Selena Rodriguez, purposefully steered her toward content Defendants knew to be harmful to children of her age and gender.

163.    Advertising content pushed to new minor users, including Selena Rodriguez, because of their age and vulnerability, purposefully steer those users toward content Defendants know to be harmful to children of their age and gender.

**E.    Inadequate Protection of Minors from Sexual Exploitation and Abuse**

164.    Defendants' products are not reasonably safe because they do not protect minor users from sexually explicit content and images, report sex offenders to law enforcement, or allow users' parents to readily report abusive users to law enforcement.

165.    Parents do not expect their children will use Defendants' products to exchange sexually explicit content and images and minor users do not expect that prurient adults pose as minors for malign purposes or that exchange of such content will be deleterious to their personal safety and emotional health.

166.    Minor users of Defendants' products lack the cognitive ability and life experience to identify online grooming behaviors by prurient adults and the psychosocial maturity to decline invitations to exchange salacious material.

167.    Defendants' products are unreasonably dangerous and defective as designed

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

because they allow minor children to use "public" profiles, in many cases default "public" profiles, that can be mass-messaged by anonymous and semi-anonymous adult users for the purposes of sexual exploitation and grooming, including the sending of encrypted, disappearing messages and cash rewards through Defendants' integrated design features.

**F.     Design of Addictive Social Media Products**

168.    As designed, Defendants' social media products are addictive to minor users as follows: When minors use design features such as "likes" or "streaks" it causes their brains to release dopamine, which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use Instagram, not for enjoyment, but simply to feel normal. Once they stop using Instagram, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

169.    Addictive use of social media by minors is psychologically and neurologically analogous to internet gaming disorder as described in the American Psychiatric Association's 2013 *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition.

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

170.    The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming referenced in DSM 5 and include:

a.  Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible.

b.  Tolerance, the need to spend more time using social media to satisfy the urge.

c.  Inability to reduce social media usages, unsuccessful attempts to quit gaming.

d.  Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

e.  Continuing to use social media despite problems.

f.  Deceiving family members or others about the amount of time spent on social media.

g.  The use of social media to relieve negative moods, such as guilt or hopelessness; and

h.  Jeopardized school or work performance or relationships due to social media usage.

171.    Defendants' advertising profits are directly tied to the quantity of their users' online time and engagement, and their algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

172.    It is feasible to make Defendants' products not addictive to minor users by turning off the algorithms, limiting the frequency and duration of access, and suspending service during

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 43
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

sleeping hours. Designing software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours could be accomplished at negligible cost; whereas the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide, and other forms self-harm among this vulnerable age cohort.

**G.    Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users**

173.    Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants know to be harmful and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns.

174.    It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive or occurs during sleep time. It is feasible for Defendants to design products that identify a significant percentage of its minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

175.    Defendants' products are not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Defendants have not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users. Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants' data and algorithms to identify and restrict improper sexual solicitation, commercial sex acts,

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 44
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

exploitation, and abuse by adult users.

176.    It is reasonable for parents to expect that platforms such as Instagram, Snapchat, and TikTok which actively promote their services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

177.    As a proximate result of these dangerous and defective design attributes of Defendants' products, Selena Rodriguez suffered severe mental harm, leading to physical injury and death, from her use of Instagram, TikTok, and Snapchat.

178.    As a result of these defective design attributes of Defendants' products, Selena Rodriguez has suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

179.    As a result of these dangerous and defective design attributes of Defendants' products, Plaintiff Tammy Rodriguez has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

180.    Defendants are further liable to Plaintiff for punitive damages based upon the willful and wanton design of their products that were intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Instagram, TikTok, and Snapchat.

**H.     Defendants' Creation of Harmful Content**

181.    Defendants create and/or license images, GIFs, music, audio, and video content that materially contribute to the creation and/or development of the content in social media postings

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 45
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

that minor users such as Selena Rodriguez send and receive.

182.    The images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms are substantial factors in making Defendants' social media products addictive to minor users such as Selena Rodriguez. Without images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms, minor users would not experience the level of dopamine response that renders Defendants' social media products addictive. The images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms therefore make Defendants' social products unreasonably dangerous in violation of Connecticut and California law and substantially contribute to the product defect claims alleged herein.

183.    The images, gifs, music, audio and video content images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms substantially contribute to the psychologically harm experienced by minor users such as Selena Rodriguez. Without images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms, minor users would not experience the level of psychological distress they sustain from Defendants' social media products. The images, GIFs, music, audio, and video content created and/or licensed by Defendants and incorporated into their social media platforms therefore make Defendants' social products unreasonably dangerous in violation of Connecticut and California law and substantially contribute to the product defect claims alleged herein.

### COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)

184.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 183

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 46
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

as if fully stated herein.

185.    Meta's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left Defendant's control, reached the user or consumer without substantial change in the condition in which it was sold, and was a cause of Selena Rodriguez's injury.

186.    Snapchat's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left Defendant's control, reached the user or consumer without substantial change in the condition in which it was sold, and was a cause of Selena Rodriguez's injury.

187.    TikTok's product is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the product unreasonably dangerous to persons or property, existed at the time the product left Defendant's control, reached the user or consumer without substantial change in the condition in which it was sold, and was a cause of Selena Rodriguez's injury.

188.    Defendants' products are unreasonably dangerous and defective because they

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 47
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

contain no warning to users or parents regarding the addictive design and effects of Snapchat, Instagram, and TikTok.

189.    Defendants' social media products rely on highly complex and proprietary algorithms that are both undisclosed and unfathomable to ordinary consumers who do not expect that social media platforms are physically and/or psychologically addictive.

190.    The magnitude of harm from addiction to Defendants' products is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

191.    The harms resulting from minors' addictive use of social media platforms have been not only well-documented in the professional and scientific literature, but Meta had actual knowledge of such harms. On information and belief, Snap and TikTok have also conducted internal studies documenting the addictive quality and harmful effects of its social media products on minor users.

192.    Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

193.    It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 48
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

194.     Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the products reasonably safe during ordinary and foreseeable use by minors.

195.     As a result of Defendants' failure to warn, Selena Rodriguez suffered severe mental harm, leading to physical injury, from her use of Instagram, Snapchat, and TikTok.

196.     As a result of Defendants' failure to warn, Selena Rodriguez suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

197.     As a result of Defendants' failure to warn, Plaintiff Tammy Rodriguez has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

198.     Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton failure to warn of known dangers of their products that were intentionally marketed and sold to minor users, whom they knew would be seriously harmed through their use of Instagram, TikTok, and Snapchat.

## COUNT III – NEGLIGENCE

199.     Plaintiffs reallege each and every allegation contained in paragraphs 1 through 198 as if fully stated herein.

200.     At all relevant times, Defendants had a duty to exercise reasonable care and caution to protect users from foreseeable harms arising out of use of their social media products.

201.     Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, which results in a diminished

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 49
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters. Defendants intentionally designed and marketed their social media platforms to be both attractive and harmful to underage users, sometimes referred to an "attractive nuisance." Rather than take reasonable precautions to prevent minors from harmful and problematic behaviors, Defendant intentionally designed its platforms to attract and addict vulnerable minor users.

202.    As California product manufacturers marketing and selling products to residents of Connecticut, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and sale of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

203.    As business owners, Defendants owe their users—who visit Defendants' social media platforms and from whom Defendants derive billions of dollars per year in advertising revenue—a duty of ordinary care substantially similar to that owed by physical business owners to their business invitees.

204.    Defendants were negligent, grossly negligent, reckless, and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like Selena Rodriguez, using their Instagram, TikTok, and Snapchat products.

205.    Defendants were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of their products and levels of problematic use amongst minor users. Defendants' have extensive internal research indicating that their products are harmful, cause extensive mental harm, and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 50
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

206.     Defendants were negligent in creating and/or licensing images, GIFs, music, audio, and video content that materially contribute to the creation and/or development of the content in social media postings that minor users such as Selena Rodriguez send and receive and substantially contribute to the minor users' addiction to Defendants' social media products and the psychologically harm experienced by minor users such as Selena Rodriguez.

207.     Defendants were negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use their social media platforms and features.

208.     Defendants were negligent in failing to fully assess, investigate, and restrict the use of Instagram, Snapchat, and TikTok by adults to sexually solicit, abuse, manipulate, and exploit minor users of their Instagram, Snapchat, and TikTok products.

209.     Defendants were negligent in failing to provide users and parents the tools to ensure their social media products were used in a limited and safe manner by underage users.

210.     As a result of Defendants' negligence, Selena Rodriguez suffered severe mental harm, leading to physical injury and death, from her use of and exposure to Instagram, TikTok, and Snapchat.

211.     As a result of Defendants' negligence, Selena Rodriguez suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.

212.     As a result of Defendants' negligence, Plaintiff Tammy Rodriguez has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

213.     Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton conduct toward underage users, including Selena Rodriguez, whom they knew

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 51
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

would be seriously harmed through the use of Instagram, TikTok, and Snapchat.

**COUNT IV – VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**

**(Cal. Bus. & Prof Code §§ 17200, *et seq.*)**

214.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 213 as if fully stated herein.

215.    Defendants are each a "person" as defined under California Business & Professions Code § 17201.

216.    The UCL prohibits all conduct that is unlawful, unfair, or fraudulent.

217.    Defendants' conduct is unlawful as set forth in Counts I-III, above.

218.    Defendants engaged in fraudulent and deceptive business practices in violation of the UCL by promoting products to underage users, including Selena Rodriguez, while concealing critical information regarding the addictive nature and risk of harm these products pose. Defendants knew and should have known that their statements and omissions regarding the addictive and harmful nature of their products were misleading and therefore likely to deceive the members of the public who use Defendants' products and who permit their underage children to use Defendants' products. Had Plaintiff known of the dangerous nature of Defendants' products, she would have taken early and aggressive steps to stop or limit her daughter's use of Defendants' products.

219.    Defendants' practices are unfair and violate the UCL because they offend established public policy, and because the harm these practices cause to consumers greatly outweighs any benefits associated with them.

220.    Defendants' conduct has resulted in a substantial injury that Plaintiff could not reasonably have avoided because of Defendants' deceptive conduct. This substantial harm is not

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 52
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

outweighed by any countervailing benefits to consumers or competition.

221.    As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the UCL described in herein. As a direct and proximate result of the foregoing acts and practices, Defendants have also obtained an unfair advantage over similar businesses that have not engaged in such practices.

222.    As a result of Defendants' UCL violations, Plaintiff suffered an injury in fact and lost money as set forth above and detailed in her prayer for relief.

223.    Accordingly, Plaintiff seeks injunctive and equitable relief to halt and remedy Defendants' unlawful, fraudulent, and unfair conduct.

## COUNT V – VIOLATION OF 18 U.S.C. § 1595 and 1591

### (Against all Defendants)

224.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 223 as if fully stated herein. Plaintiff brings claims under 18 U.S.C. § 1595 based on Defendants' financial benefit garnered from knowingly assisting, supporting, and facilitating the sexual solicitation and exploitation of Selena Rodriguez for commercial sex acts. Defendants knowingly used the instrumentalities of interstate commerce to violate 18 U.S.C. § 1591. Defendants knowingly received something of value from participation in a venture which recruits or entices a person knowing, or in reckless disregard of the fact, that Selena Rodriguez had not attained the age of 18 years and was caused to engage in a commercial sex act as defined by 18 U.S.C. § 1591(a).

225.    Defendants are aware of, and knowingly benefit, from a large number of predatory users who regularly use Defendants' platforms to solicit and groom minor users such as Selena

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 53
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

Rodriguez into sexually compromising situations and lure them into being sexually exploited and trafficked for the purposes of commercial sex acts as defined in 18 U.S.C. § 1591.

226.    Defendants had actual knowledge that Selena Rodriguez was under the age of 13 based on her user history, photographs, and videos, and repeated statements made on Defendants' social media platforms—including to several adult men with whom she was exchanging sexually explicit material—that she was underage. Defendants also had actual knowledge that the men with whom she was communicating on their platforms were adults based on their user history and profiles. Defendants' technology provided them with actual knowledge that Selena was exchanging sexually explicit photographs and video with adult men in a manner that constituted commercial sex acts under 18 U.S.C. § 1591.

227.    Defendants have designed and marketed their products in such a way as to appeal to and make clear that predatory users may use their products for these illegal purposes. This includes, for example, Snapchat's development and marketing of disappearing messages (which feature Instagram also now offers). Many of Defendants' users are sexual predators—adults who use Defendants' products to prey on underage children, including children as young as Selena Rodriguez, who was only 10 years old when she started using Defendants' products.

228.    Defendants' greatest source of revenue also comes from advertisements, and Defendants are paid in direct correlation to how much time a user stays on their product. Defendants lack the financial incentive to create a product that denies access to underage users and, likewise, Defendants make money each time their predatory users solicit, exploit, or otherwise engage young children through their social media platforms.

229.    Defendants have failed to undertake reasonable efforts to redesign their social media platforms to protect their minor users, such as Selena Rodriguez, against such harms.

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 54
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

230.    To the contrary, Defendants knowingly provide sexual predators with tools such as anonymity, encrypted and/or disappearing messaging, selected content involving minors, financial transfer, and location features that are used by adults to target minor users for commercial sex acts. Defendants' products are designed to and do work in concert with each other. Defendants know that these tools in its social media platforms make it easier for adult predators to efficiently and anonymously identify and recruit large numbers of minors to engage in commercial sex acts than if these abusers did not have access to Defendants' platforms.

231.    For example, a common practice among predatory users is to find a minor user through Instagram's public profile, recommendation, and other information sharing features. Once contact is established, the predator asks "What's your Snap" or a similar question, designed to obtain the child's Snapchat information. Or, in cases where the child does not have a Snapchat account, the predator will encourage them to open one. The predator then moves the discussion onto Snapchat because they know that Snapchat's product design and practices will enable them to send harmful and illegal content to minors that then simply disappears.

232.    Defendants knowingly implemented policies and design features that obstructed, interfered with, and prevented the enforcement of the child sexual exploitation protections set forth in 18 U.S.C. § 1591.

233.    As a result of Defendants' violations of 18 U.S.C. § 1595 and 1591, Selena Rodriguez suffered severe mental harm, leading to physical injury, emotional harm, and death from sexual exploitation and solicitation of commercial sex acts directed toward her because of Instagram, Snapchat, and TikTok and, specifically, because of the defects and/or inherently dangerous features and design of Defendants' products.

234.    As a result of Defendants' violations of 18 U.S.C. § 1595 and 1591, Tammy

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

Rodriguez has suffered loss of consortium, emotional distress, past and future medical expenses, and pain and suffering.

235.   As a result of Defendants' violations of 18 U.S.C. § 1595 and 1591, Plaintiff is entitled to full compensatory and punitive damages against Defendants for the mental and physical injuries suffered by Selena Rodriguez.

236.   Defendants are further jointly and severally liable to Plaintiff for punitive damages and attorneys' fees and costs based upon their knowing, intentional, willful, and wanton conduct toward Selena Rodriguez and other minor users whom they knew were being seriously harmed through improper solicitation for commercial sex acts through the use of, or threatened use of, force, fraud, and/or coercion through Instagram, Snapchat, and TikTok.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants for relief as follows:

a) Past physical and mental pain and suffering of Selena Rodriguez, in an amount to be more readily ascertained at the time and place set for trial;

b) Loss of enjoyment of life, in an amount to be more readily ascertained at the time and place set for trial;

c) Past medical care expenses for the care and treatment of the injuries sustained by Selena Rodriguez, in an amount to be more readily ascertained at the time and place set for trial;

d) Past and future impairment to capacity to perform everyday activities;

e) Plaintiff's pecuniary loss and loss of Selena Rodriguez's services, comfort, care, society, and companionship to Tammy Rodriguez;

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 56
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862

f)   Loss of future income and earning capacity of Selena Rodriguez;

g)   Punitive damages;

h)   Injunctive relief, including, but not limited to, ordering Defendants to stop the harmful conduct alleged herein, remedy the unreasonably dangerous algorithms in their social media products, and provide warnings to minor users and their parents that Defendants' social media products are addictive and pose a clear and present danger to unsuspecting minors;

i)   Reasonable costs and attorney and expert/consultant fees incurred in prosecuting this action; and

j)   Such other and further relief as this Court deems just and equitable.

Dated: May 6, 2022.

ANDRUS ANDERSON LLP

By:  */s/ Jennie Lee Anderson*
          Jennie Lee Anderson

Jennie Lee Anderson (SBN 203586)
jennie@andrusanderson.com
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA  94104
Telephone: (415) 986-1400
Facsimile: (415) 986-1474

SOCIAL MEDIA VICTIMS LAW CENTER PLLC

By:  */s/ Matthew Bergman*
          Matthew Bergman

Matthew Bergman (*Pro Hac Vice*)
matt@socialmediavictims.org
Laura Marquez-Garrett, SBN 221542
laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER PLLC
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862
Facsimile: (206) 957-9549
**Attorneys for Plaintiff**

SECOND AMENDED COMPLAINT FOR WRONGFUL
DEATH AND SURVIVORSHIP - 57
NO. 3:22-cv-0401-JD

SOCIAL MEDIA VICTIMS
LAW CENTER PLLC
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
(206) 741-4862