JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-3089

ROSE LEDA EHLER (State Bar No. 296523)
rose.ehler@mto.com
LAURA M. LOPEZ (State Bar No. 313450)
laura.lopez@mto.com
ARIEL TESHUVA (State Bar No. 324238)
ariel.teshuva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702

LAUREN BELL (*pro hac vice*)
lauren.bell@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500 E
Washington D.C., 20001
Telephone: (202) 220-1125

Attorneys for SNAP INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| TAMMY RODRIGUEZ, individually and as the Personal Representative of the Estate of Selena Rodriguez,<br><br>Plaintiff,<br><br>vs.<br><br>META PLATFORMS, INC., formerly known as FACEBOOK, INC.; SNAP, INC.; TIKTOK INC.; and BYTEDANCE INC.,<br><br>Defendants. | Case No. 3:22-cv-00401<br><br>**DEFENDANT SNAP INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Date Action Filed:  January 20, 2022<br>Judge:  Judge James Donato<br>Trial Date:  Not set<br>Hearing Date:  October 13, 2022<br>Hearing Time:  10:00 a.m.<br>Courtroom:  11, 19th Floor |

## I. INTRODUCTION

Snap operates a camera and communications application called Snapchat, whose core feature is its messaging functionality. Snapchat allows users to have conversations by exchanging messages called "snaps." Although Plaintiff tries to lump all three defendants together, the specific allegations of the Second Amended Complaint ("SAC") concede, as they must, that Snapchat is fundamentally different from the other defendants' platforms. Snapchat was founded as an alternative to traditional "broadcast" social media platforms that open to a refreshable feed of public or broadly-shared content. Instead, Snapchat offers a platform primarily for online communications between real friends that—like real, in-person conversations—are set to disappear after being viewed, rather than create a public or permanent record. Second Amended Complaint ("SAC") ¶ 37. Snap takes seriously its users' well-being and is committed to prioritizing both their safety and privacy. Snapchat thus prohibits sexually explicit content and sharing private snaps without consent, and does not enable searchable public profiles for minor users. Rather, Snapchat focuses on facilitating communications between people who already know each other in real life.

Without differentiating among platforms, Plaintiff alleges that her daughter Selena was a heavy user of "social media" generally who was victimized by third parties on various platforms, suffered real-world bullying in school, and later committed suicide. Selena's death is a horrific tragedy. As the Joint Motion to Dismiss ("Joint Motion") explains, however, multiple legal principles prohibit holding Internet platforms—as opposed to the third parties who perpetrated the alleged harm—liable. This is particularly true in the case of Snap. Indeed, when the allegations directed *specifically at Snap*—of which there are few—are isolated and considered, it is clear that they fail to state a claim:

- *First*, the SAC's specific allegations establish that the claims against Snap rest on alleged harassing Snapchat messages Selena received from third parties after meeting them on other platforms. Plaintiff does not allege that any of Selena's specific encounters began on Snapchat, or that Snapchat prompted or recommended any harmful content to Selena (algorithmically or otherwise). Claims seeking to hold a platform liable for harmful direct messages fall within the heartland of Section 230 and should be dismissed. *Barnes v.*

*Yahoo!, Inc.*, 570 F.3d 1096, 1103 (9th Cir. 2009) (liability for "fail[ing] to remove" content "treat[s] the liable party as a publisher of that content"). Snap cares deeply about its users' safety and devotes significant resources to detecting and removing harmful content.¹ But holding Snap liable for failing to manually monitor all private user communications to ensure no single user sends a harmful message both invades user privacy and is contrary to the purposes of the CDA, which is to *encourage* the voluntary moderation of content without fear of liability for content missed. *Id*. at 1099–1100.

- ***Second***, the allegations regarding Selena's use of Snapchat make clear that it was not Snap that proximately caused her harm, but rather the criminal actions of third parties who harassed and tormented her. Snapchat's provision of a neutral communications platform that some (but not all) of Selena's tormenters abused does not establish causation as a matter of law.

## II.  FACTUAL ALLEGATIONS REGARDING SNAPCHAT

The allegations about Snapchat are sparse. Plaintiff's daughter, Selena Rodriguez, allegedly began using Snapchat, Instagram, and TikTok, when she was 9 years old, though Snapchat prohibits users under 13. SAC ¶ 103. Plaintiff alleges that Selena became addicted to "social media" though does not differentiate among platforms. The SAC describes exploitative conversations Selena had with people on Instagram, in which explicit messages and photos were exchanged. *Id.* ¶¶ 115-32. The SAC then alleges that Selena "would receive a message from an adult user on Instagram telling her to send lewd photos of herself on Snapchat or TikTok," and that on two (of at least eight) occasions, a discussion "moved" to Snapchat. *Id.* ¶¶ 122, 128–130. An image Selena allegedly sent on Snapchat was circulated among her classmates. *Id.* ¶ 110.

Although Plaintiff refers generically to the alleged harmful effect of "algorithms" that allegedly "directed [Selena] to harmful content and connected her with sexual predators," Dkt. No. 64 at 1 (CMS); SAC ¶¶ 75-84, there are ***no*** allegations that any ***Snapchat*** algorithm directed her to harmful content or users and Plaintiff's specific allegations as to Snap do not focus on the

---

¹ For example, Snap uses computer tools designed to prevent, detect, and enforce against particularly dangerous content, like known drug symbols and child sexual abuse materials.

algorithmic delivery of content. *Compare* SAC ¶¶ 28–29 (Meta), ¶¶ 47–49 (TikTok), ¶¶ 37–40 (Snap). Nor does Plaintiff allege that any of the bad users—most of whom were "complete strangers" (*id*. ¶ 104)—first contacted Selena on Snapchat or even that minors' profiles are publicly searchable on Snapchat. *Cf. id.* ¶ 123 (alleging exchanges on Instagram "originat[ed] because of" a "public profile product feature"). The allegations against Snap are all based on Selena's use of Snapchat for ***direct messaging***: that Selena was solicited by adults elsewhere and then used Snapchat's messaging tools to communicate with them. *Id*. ¶¶ 115, 122, 129-30.

Although the complaint mentions Snapchat features beyond the core messaging functionality, it does not connect them to this case; for instance, Plaintiff cites "trophies, streaks,[2] and other signals of social recognition" on Snapchat, but does not identify any harm to Selena from them. SAC ¶ 39.

The SAC also devotes multiple paragraphs to the internal documents and public statements of another defendant. *E.g.,* SAC ¶¶ 74, 98. These documents have no connection to Snapchat and may not be considered as to Snap. *In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888, 908 (N.D. Cal. 2008) (plaintiff cannot "obfuscate[] what role[]" each defendant "independently played in the alleged harm and whether [each] is liable for its own conduct.").

### III.  THE CDA BARS PLAINTIFF'S CLAIMS AGAINST SNAP

#### A.  The Allegations Against Snap Run Headlong Into the CDA

As the Joint Motion explains, third-party content is at the heart of Plaintiff's claims against all Defendants. *See* Joint Mot. at 9-11. But this is particularly true as to Snap, where Selena is not alleged to have had any harmful content or users pushed to her via Snapchat (algorithmically or otherwise) and where Plaintiff does not allege that any damaging encounters began on Snapchat (rather, they began on other platforms and "moved" to Snapchat).

Courts consistently have refused to hold Snap liable under such circumstances. For instance, in *Doe through Next Friend Roe v. Snap, Inc.*, 2022 WL 2528615 (S.D. Tex. July 7, 2022), a federal court recently dismissed claims against Snap based on a teacher's alleged use of the platform to sexually abuse her student. The court rejected Plaintiff's products liability theories, which alleged that Snapchat was negligently designed to "draw[] in sexual predators and allow[] them to act with

---

[2] "Streaks" are not "likes" (SAC ¶ 39); they show how many days one person messaged another.

impunity,'" including by allowing the use of "false birth dates," and "creating a platform that deletes messages and images shortly after they are sent," *id.* at *12, correctly noting that these allegations were simply a dressed-up attempt to hold Snap liable for messages sent by the teacher and were thus barred by the CDA. *Id.* at *15. And in *Palmer v. Savoy*, 2021 WL 3559047 (N.C. Super. July 28, 2021), the court rejected the plaintiff's similar products liability theory that Snapchat's "ephemeral nature" was "designed" and used to "promote[] . . . graphic sexual violence," such that Snap could be held liable for revenge porn images of the plaintiff shared on the platform. *Id.* at *1, *2. Rather, the court held that the plaintiff's claims "depend[ed] upon the actual content of the snaps taken by" third parties, dismissing the claims as barred by the CDA. *Id*. at *6; *see also Grossman v. Rockaway Tp*., 2019 WL 2649153, at *4, *7 (N.J. Super. June 10, 2019) (rejecting attempt to transform claim based on harmful third-party messages into a claim of Snapchat's "unreasonably dangerous" design).

### B. Plaintiff's Attempt to Evade the CDA Fails As to Snap

Nor can Plaintiff evade the CDA by focusing on Snap's "disappearing messages" feature. The decision to *delete* content—i.e. make it ephemeral (*see* SAC ¶ 37)—is squarely within the publisher activity covered by the CDA. *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 25-27 (2021) (collecting cases dismissing claims seeking to hold platforms "liable for removing or blocking content"); *Palmer*, 2021 WL 35590 at *2, 6 ("ephemeral nature" of snaps protected by CDA); *Doe*, 2022 WL 2528615 at *15 ("allow[ing] [snaps] to automatically delete after a short period of time" protected by CDA). Moreover, Snap hardly pioneered ephemeral communications—throughout history, almost all communications have been ephemeral, from in-person to telephone conversations, to Zoom and FaceTime calls today. *Cf. In re Zoom Video Commc'ns Inc. Priv. Litig.*, 525 F. Supp. 3d 1017, 1034 (N.D. Cal. 2021) (CDA barred claims based on third parties "disrupt[ing] Zoom meetings"). The SAC also concedes that the majority of harmful conversations to which Selena was subjected—including harassing conversations and the exchange of sexually explicit images— occurred without regard to the ephemerality of the platform: indeed, the SAC details multiple such conversations on other platforms where the communications were not deleted. *E.g.,* SAC ¶ 125.

Likewise, the alleged fact that Snapchat makes special effects, music, and videos available for users to incorporate into their posts, SAC ¶¶ 43, 136, 181-82, does not transform Snap into an

"information content provider"; to qualify, a platform must "contribute[] materially to the alleged illegality of the conduct." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1165, 1167-68 (9th Cir. 2008). Plaintiff does not allege that the music or special effects *themselves* contributed to the *illegality* of any content at issue. Moreover, providing such content neutral tools to create and display content does not render Snap an information content provider. *See Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098-99 (9th Cir. 2019).

Finally, Plaintiff's theory has undesirable consequences. Plaintiff faults Snap for failing to manually screen the content of *all* private user messages and prevent misconduct or report unhealthy use. That outcome is directly at odds with the balance Congress struck with Section 230 and risks a chilling effect on speech and the free flow of information. *See Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 19 (1st Cir. 2016) (platforms "may have an infinite number of users generating an enormous amount of potentially harmful content, and holding website operators liable for that content 'would have an obvious chilling effect'") (citation omitted); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 333 (4th Cir. 1997) (without immunity platforms would face an "impossible burden" and "ceaseless choices" between suppressing speech or prohibitive liability).

## IV. PLAINTIFF HAS NOT ALLEGED CAUSATION AS TO SNAP

Plaintiff's specific allegations against Snap also make clear that Snap was not the proximate cause of Selena's harm. Rather, it was criminal third parties—who allegedly found and connected with Selena on *other platforms*—whose actions led to Selena's suicide. SAC ¶¶ 112, 122, 128–133; Joint Mot. at 16-17. There is *no* allegation that Snap itself recommended or connected Selena to any harmful third-party content or users. At most, the SAC alleges that Snap provided a neutral communications platform where Selena received allegedly harassing messages from third parties. As a matter of law, providing this communications platform did not legally cause Selena's harm. *See Fields v. Twitter, Inc.*, 881 F.3d 739, 749-50 (9th Cir. 2018) (no proximate cause where Twitter allegedly "facilitated the organization's growth and ability to plan and execute terrorist acts"); *Crosby v. Twitter, Inc.*, 921 F.3d 617, 624-25 (6th Cir. 2019) (dismissing claims against platforms for mass shooting; defendants "do not proximately cause all the[] potential ripples" of harm that flow from "'highly interconnected' nature of social media").

DATED: July 25, 2022              MUNGER, TOLLES & OLSON LLP

                                  By:    */s/ Jonathan H. Blavin*
                                       JONATHAN H. BLAVIN
                                  Attorneys for SNAP INC.